**Frederick COMISKEY and Anton Juncaj, Plaintiffs,**

v.

**AUTOMOTIVE INDUSTRY ACTION GROUP (A.I.A.G.) and Darlene Miller, Defendants.**

**No. 98–CV–71736–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 11, 1999.

Alan B. Posner, Detroit, MI, for plaintiffs.

Todd Shoudy, Detroit, MI, for defendants.

*OPINION AND ORDER REGARDING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

ROSEN, District Judge.

## I. *INTRODUCTION*

This "reverse sex discrimination" case is presently before the Court on Defendants' Motions for Summary Judgment. Plaintiff has responded to Defendants' Motions to which Response Defendants have replied. Having reviewed and considered the parties' briefs and supporting evidence and having heard the oral arguments of coun-

sel at the hearing held on January 28, 1999, the Court is now prepared to rule on Defendants' Motions. This Opinion and Order sets forth the Court's ruling.

## II.  FACTUAL BACKGROUND

Plaintiffs Frederick Comiskey and Anton "Tony" Juncaj are former employees of Automotive Industry Action Group ("A.I.A.G."), a non-profit trade association serving manufacturers and suppliers of the automotive industry. Plaintiff Comiskey began his employment with A.I.A.G. in December 1993 as a Junior Accountant. In February 1996 he was promoted to the position of Membership Supervisor. On August 13, 1997 Comiskey's employment was terminated for improperly accessing confidential computer files of other employees.

Plaintiff Juncaj was employed as the editor of A.I.A.G.'s monthly magazine, *Action Line.* He was hired in July 1988 and fired on April 18, 1997 for conduct "out of line for management."

Defendant Darlene Miller is the Managing Director of A.I.A.G.. She has held that position since January 1, 1997. As the Managing Director, Ms. Miller answers to the Executive Director and a 21-member Board of Directors, all of whom are men. Immediately below Ms. Miller in the organizational structure of A.I.A.G. are three Directors two of whom are men and the third is a woman. Richard Marsolais, the Director of Membership Services, was Comiskey's and Juncaj's immediate supervisor.[1] Marsolais made the decision to terminate both Comiskey's and Juncaj's employment with the advice and approval of Darlene Miller and the Executive Director.

### THE OFFICE ENVIRONMENT AT A.I.A.G. PRIOR TO THE HIRING OF DARLENE MILLER

Ms. Miller's predecessor as A.I.A.G.'s Managing Director was Bill Fleming, who left the organization in mid–1996. Hence, A.I.A.G. operated for more than six months without a full-time Managing Director. During Fleming's tenure and in the six-months prior to the hiring of Ms. Miller, the A.I.A.G. staff, including both Plaintiffs, routinely engaged in what best can be characterized as "unprofessional" activities. Plaintiff Comiskey routinely downloaded nude photographs of women off the Internet while at work, displaying the photographs on his computer screen to all who walked by his cubicle. He also prepared a 12–month "Power Point" presentation with a different nude woman representing each of the twelve months of the year which he circulated to other male employees, including his supervisor. Plaintiff Juncaj regularly prepared and circulated to both male and female staff members supervisors' meeting minutes which were rife with sexual comment and innuendo. Further, Juncaj and one of his female subordinates, Sarah Mazure, routinely engaged in sexually-charged banter and sent sexually-charged e-mail to each other.[2]

### DARLENE MILLER AND TAMMY DUNN'S "BY THE BOOK" APPROACH

In August 1996, four months before Ms. Miller came on board, A.I.A.G. hired a new Human Resources Manager, Tammy Dunn. She attended the weekly supervisors' meetings and received copies of the minutes prepared by Juncaj. Ms. Dunn noticed the repeated sexual references and was approached by several other managers about the unprofessional discussions in the minutes. In response to these concerns, one of Ms. Dunn's first official acts as

---

**1.** The other male director, James Prusak, is the Director of Operations. Mr. Prusak was the individual involved in investigating the facts which led to the discharge of Plaintiff Comiskey.

**2.** As discussed below, it is Juncaj's e-mail tirade to Ms. Miller following his failed attempt to have Ms. Mazure promoted that ultimately led to his firing.

Human Resources Manager was to hold a company-wide sexual harassment training session. The training was conducted by Gail Cober, a representative of the E.E.O.C., on November 22, 1996. This training session included the presentation of an anti-sexual harassment video.

After the session, employees who attended were asked to sign an acknowledgment that they had done so. Although Comiskey signed his acknowledgment, he did so by noting on the form that the training consisted of "a sexist video". Even after this training session, Juncaj wrote two staff appreciation "kudos" [3] with inappropriate sexual language for two female employees to be read to the entire staff in mid-January 1997. Darlene Miller, who had just two weeks earlier taken over the Managing Director position, stopped Juncaj from reading the "kudos" immediately before Juncaj was about to read them to the entire staff.[4]

The office environment problem came to a head in February 1997 when Trish Steding, a female employee who was under Tony Juncaj's supervision, made a verbal complaint of sexual harassment to Human Resources Manager Tammy Dunn. Steding did not identify Juncaj, her direct supervisor, or any other specific employee as the "harasser"; rather her complaint about the "general" environment.[5] She further requested that she not be identified as the person making the complaint.

In response, Dunn brought Gail Cober, the EEOC representative, back in for an additional training session for supervisors. This training was held on March 24, 1997. Additionally, because the complaint originated from Richard Marsolais' area of responsibility, Marsolais was directed to meet with his three supervisory employees, Juncaj, Comiskey, and Ms. Jean Czopek. In meeting with Juncaj and Comiskey, Marsolais told them that a sexual harassment complaint had been made and that they, therefore, should watch their behavior. Despite being repeatedly told that the identity of the sexual harassment complainant was confidential, Juncaj and Comiskey persisted in requesting that the person be identified. Tammy Dunn, Marsolais and EEOC representative Cober all answered that the complainant's identity would remain confidential despite their repeated requests.

## THE TERMINATION OF ANTON JUNCAJ

Meanwhile, upon assuming the position of Managing Director in early 1997, Darlene Miller instituted, and insisted upon adherence to, a number of "by-the-book" procedures. One of these procedures was requiring that all open positions would need to be posted and employees be allowed to bid on them.

There were three A.I.A.G. employees who reported directly to Anton Juncaj— Trish Steding, the sexual harassment complainant who was the Associate Editor of *ActionLine*, Sarah Mazure, a part-time staff writer/senior editor (who was the person with whom Juncaj engaged in sexual banter and e-mail), and Dave Gwozdz, an advertising salesperson.

Trish Steding resigned in April 1997. Shortly thereafter, Juncaj requested permission from Tammy Dunn and Darlene Miller to promote Mazure to full-time, leaving her title as "Senior Editor" but place her in the full-time slot vacated by

---

3. The "kudos" awards were used by A.I.A.G. to display appreciation to employees.

4. Miller testified in her deposition that when she was hired, she read the past supervisory meeting minutes prepared by Juncaj which contained the numerous sexual references and shortly thereafter she was confronted with the "kudos" issue. [Miller dep. p. 68]. She stated that at that time she was not aware of the downloading of pornographic pictures, the 12–month "power point" presentation

with nude women or the inappropriate e-mails. *Id.*

5. Tammy Dunn testified in her deposition that Ms. Steding's complaint was of the "general" atmosphere in the workplace, when asked for examples of what she found to be offensive conduct, Ms. Steding identified particular comments made by Frederick Comiskey and Rick Marsolais. She said she had no problems with her immediate supervisor, Tony Juncaj.

Steding. Dunn informed Juncaj that he would have to post the position and interview candidates; he could not simply elevate Mazure to a vacated full-time slot and by-pass the posting/bidding procedure by not changing her job title.

Juncaj reacted angrily and rudely to Dunn. When the matter was brought to Darlene Miller's attention, she was unhappy with Juncaj's reluctance to follow procedure and sent Rich Marsolais an e-mail directing him to discuss the issue with him.

> TO: rich marsolais
>
> CC: tammy dunn
>
> Subject: TONY J.
>
> He needs to be counseled. He was rude enough to Tammy on the phone today to cause her to complain to me. It's bad enough when I (and you) have to deal with problems created by lower level staff who don't know any better, but it's unacceptable coming from a member of our management team. I don't have time for this, neither do you or Tammy. Make it clear to him that:
>
> 1. The behaviour [sic] is unacceptable
>
> 2. 99.9% of the time when someone from HR [human resources] asks a manager/supervisor to do something, it's for that manager/supervisor's own good. Not only will he do it—he WILL BE happy that it was brought to his attention!!
>
> This is NO exception; she's doing her best to keep him employed, out of trouble and out of court. We've already had a sexual harassment complaint filed; Tony is definitely a contributor to the general atmosphere referenced in that complaint, and you've already had that conversation with him. Now he wants to put Sarah into the position vacated by Trish. I have no problem with that, if she's the best qualified person that we can find. Apparently though, there's a rumor flying around that they're seeing each other. I don't know that for a fact, and it's not something brought up in the complaint. I can't do much about a rumor.
>
> But we will make sure everything is done by the book:
>
> 1. He'll define the requirements needed to fill THE OPEN POSITION. Don't get creative or try to post a different position. If he needs a different position, have him justify it to you and I'll go to the B.O.D. [Board of Directors].
>
> 2. He'll seriously interview anyone internally who is interested and who passes the initial screening done by Tammy.
>
> 3. We will advertise this position and he WILL interview external candidates.
>
> 4. You, as this supervisor's manager, will participate in the "final round" of interviews for all (internal/external) candidates.
>
> Truth (and it better not be) or just rumor—that makes it necessary to do everything by the book for his sake. There won't be one staff member here (male or female) who can complain about this if Sarah does get the job. I'm not wasting any more time with this. I'll know that you've talked with him when he apologizes to Tammy and gets her the detail that she needs to post this opening.

[Plaintiffs' Ex. 8.]

Marsolais left Juncaj a voice mail directing him to follow the appropriate procedure.

Instead of discussing the policy with Mazure and encouraging her to apply for the position, Juncaj sent her the following e-mail on April 10, 1997:

> I've been informed by Tammy Dunn that you cannot be called senior editor. The open position is for associate editor, and it must be advertised as such until the job analysis study has been completed.[6] Why? I have no clue. I've had it.

---

6. The referenced "job analysis study" is discussed in detail in connection with Plaintiff Comiskey's termination, *supra*.

I'm furious. If this causes you a problem, you may give me your two-week notice and never bother me again about your title.

I'm tired of dealing with estrogen. If you need clarification on semantics please deal with her yourself. I'm done. Let me know what you want to do.

[See Defendants' Ex. 18.]

Mazure gave Juncaj her two-week notice the same day. Then, on Monday, April 14, 1997, she sent Tammy Dunn the following e-mail:

Tammy—

On Friday, I gave Tony my two-week notice of resignation from AIAG.

It is with great regret that I leave. I have deeply enjoyed my work writing for ACTIONLINE. It was always a pleasure to come to work. I gained invaluable experience under Tony's direction and always tried to give my best in return. It wasn't easy taking low pay and watching my co-workers get numerous perks I didn't, but I maintained hope I would get rewards in time, and couldn't leave the work I loved. I believe this dedication was reflected in my recent "excellent plus" performance review, as well as Tony's many mentions that ACTIONLINE was fortunate to have a writer of my caliber on its staff. However, I refuse to jump through your hoops to "apply" for a job whose title and pay are below what I've already been given. I believe that because I have spent the last 11 months proving myself a worthy employee, I should get benefits and paid vactions [sic] and holidays, as well as keep my current title and pay. I deserve them. And Tony deserves to staff his department as he sees fit—without the interference of someone who understands nothing about how to run a magazine. It is clear, Tammy, that your quest for utter control is stronger than your desire to retain a decent employee.

Just for fun I have attached my resume. I hope you keep its contents in mind as you search the masses for my replacement.

—Sarah

[Defendants' Ex. 19.]

Darlene Miller responded to Ms. Mazure's e-mail: [7]

I'm sorry that you feel this way.

But this is life in a larger organization. Tammy is only doing what I've asked of her. We are using a process that is fair to everyone and ensures that the best person gets the job. It's not changing. And like Tony, I would love to staff my own organization as I see fit—without the interference of a group of men (the Board) who know nothing about running an association. But guess what .... they have to approve ALL new positions—regardless of the department.

We'll miss you and wish you the best.

*Id.*

Juncaj responded to Miller's e-mail:

Darlene:

For the record these positions were never "posted":

Sharon Schwank—Internal quality manager (now AUTO–TECH manager)

Zita George—Education manager (then AUTO–TECH manager)

Richard Marsolais, Beth Baker & Mike Prusak—Directors

At AIAG, policy is synonymous with hypocrisy. Management seems exempt from "policy". After all, Sharon was directly your appointment.

By the way, when you were "applying" for the managing director position, you held out to get the most money you could out of AIAG. How about this for a policy: Pay people what they're worth so they can stay and make AIAG better.

*Id.*

Miller responded to Juncaj's e-mail the next morning:

I've had enough.

7. Apparently, Mazure cc'd her e-mail to Dunn to Miller and Juncaj.

First, Rich and I had Tammy handle this strictly by the book TO PROTECT YOU. There is a sexual harassment complaint hanging over our heads, and you have been a contributor to that environment. On top of that, there are rumors that you and Sarah are having an affair. Again, that's rumor, not fact. But that was enough to force us to do everything strictly by the book .... so that no one could question YOUR JUDGMENT if Sarah was given the job.

Second, you don't have your facts straight. So don't waste my time. Sharon's position was an open approved position that I filled. This was not a new position, and I don't have your history hanging over my head! No, I don't need approval to fill an open position; but yes, I did take it to the executive committee before the position was filled. All others were new positions that needed board approval before any action was taken. You wanted to make a new position (higher level senior editor) and not fill an existing position (level 2 associate editor). That requires board approval. We tried to help you fill the existing position; you could have come to me afterwards to justify the new position.

Third, you bet I held out for as much money as I could; but eventually I accepted the position for less than I wanted, less than the position should have been paid and less than I made at IBM. I made a decision, knew what I was getting into, and won't complain.

Finally, I'm doing my best to make sure that any past inequities are fixed and that everyone is paid at market. That's why I'm investing all of this time and money in the compensation study.

If you want to be a manager, start acting like one!

[Defendants' Ex. 20]

Juncaj did not stop his battle-of-the-e-mails. Late in the day on April 17, he sent Miller the following e-mail:

Ms. Miller:

I deeply regret the current state of affairs.

Your response was very unprofessional and very hurtful.

You are not protecting me. There is nothing for you to protect me from.

First of all, I am not having an affair with Sarah nor anyone else. And to base it on rumor? From whom did you obtain this information? What facts did this person or people give you to support his ludicrous, shameful allegation? How long did you know about this allegation? Why did you let it fester? If that was really your concern, why didn't you address it with Sarah or me? Rumors led to a very good employee leaving. I was getting closer to improving the magazine's editorial and image—and AIAG's—before this situation popped up.

Secondly, you attacked my integrity as an editor. You're the first to do that in the 14 years that I have been paid to run a publication. In the biz, it's called slander. I'm going to promote someone because I sleep with her? Let's see, I've been running the magazine all this time driven by my libido? Gracious me. How did I get by? You may review my evaluations, if you like, to understand why it's so insulting.

Thirdly, Sarah is married. She was devastated and mortified by this bit of cruel nonsense. The only person who found humor in this was her husband. While you're concerned about a "sexual harassment complaint hanging over our heads," her husband could have gotten wind of this from one of your "sources" and blown my head off with a just-bought .45 caliber. How are you protecting me? In addition, this could have potentially led to their breakup.

Now, how am I contributing to the sexual harassment environment? Who is this person that I've harassed? What is the nature of this complaint? What did I do? When did I do it? Why wasn't I informed about this complaint by management? Why did management let this fester?

On the other appointments, I'm afraid it's management opinion against a lowly editor's.

The senior editor position was justified. Out of curiosity, have you or Ms. Dunn looked at Sarah's 1) resume (9+ years of experience) 2) her writing skills 3) her editing responsibilities, including AUTO–TECH? Neither you nor human resources requested such information to alleviate this unfortunate situation. I wanted to make her full time and have part-time associate editor. It would have saved AIAG money. Now, AIAG is hiring two full-time people.

Again, all this is quite regretful.

As far as "acting" like a manager, there's certainly no one to learn from at this organization.

Thank you and have a wonderful day.

[Defendants' Ex. 21.]

As a result of Juncaj's e-mail tirade, Miller met with Juncaj's direct supervisor, Richard Marsolais, along with Tammy Dunn and Executive Director Dick Simmons on the morning of April 18, 1997. Marsolais made the decision to discharge Juncaj with their advice and approval. Juncaj was, thus, terminated that day, April 18, for conduct "out of line for management." As Marsolais detailed in Juncaj's Disciplinary Action Form:

A position opened in Tony's department which required internal posting. Tony was very uncooperative in fulfilling this HR [human resources] requirement; wanted to create a new, not-yet approved position; and wanted to place another employee from his department into the non-existent position, with no job posting. Subsequently, this second employee resigned, refusing to follow the required HR procedures. The managing director's acknowledgment of this resignation prompted a response by Tony that was inaccurate, accusatory and unprofessional—out of line for management. At this point the Managing Director warned him of his unacceptable behavior and again attempted to clarify the HR requirement.

Tony ignored this warning and continued with unacceptable behavior, resulting in his termination, effective 4/18/97. [Defendants' Ex. 3.] [8]

After Juncaj was fired, Marsolais made the decision to have the editorial function of the magazine farmed out to an outside independent contractor company. Coincidentally, former A.I.A.G. *ActionLine* employee, Trish Steding, worked for that company as an editor.

## THE TERMINATION OF FREDERICK COMISKEY

At the same time that Juncaj's dispute with A.I.A.G. management concerning the posting of the full-time senior editor position was going on, A.I.A.G. hired an independent human resources consulting firm to conduct a job/compensation analysis study of the organization and make recommendations regarding A.I.A.G.'s compensation program to address inequities in the

8. Immediately before Juncaj's discharge, co-plaintiff Frederick Comiskey secretly (and anonymously) forwarded two e-mails authored by Miller to the AIAG Board of Directors. One of the e-mails was the one she sent to Sarah Mazure stating

And like Tony, I would love to staff my own organization as I see fit—without the interference of a group of men (the Board) who know nothing about running an association.

The second e-mail discussed what Miller would and would not report to the Board as to her subordinates' revenue and expense projections.

Juncaj and Comiskey each claim that the real reason they each were fired was because they were each suspected of sending the e-mails to the Board. However, neither has presented any evidence to substantiate this claim. Darlene Miller testified that a voice mail message was left on her telephone on April 17th by a member of the Board of Directors telling her that he had received some anonymous e-mails from AIAG and was confused so he wanted to talk to her about them as soon as possible. After talking to the board member briefly the morning of April 18th, it was agreed that he would bring the e-mails to her later that day. They were not delivered to her, however—nor did she know their content—until after the decision had already been made to discharge Juncaj.

system. On April 19, 1997 (the day after Anton Juncaj's termination), Frederick Comiskey submitted a letter to Tammy Dunn questioning the compensation study and complaining about his pay and what he perceived to be "wage discrimination". [See Defendants' Ex. 22]. Although phrased as "discrimination", Comiskey's complaint was not about sex, race, or ethnic discrimination; rather, it was about differences in the salaries of various positions at A.I.A.G. Specifically, Comiskey complained that the $32,000 he was paid in his management level "Membership Supervisor" position was less than the salaries paid to other management level supervisors and to various non-management employees, to-wit, the positions of executive assistant, "supply guy" (i.e., procurement clerk), marketing assistant, education clerk. Nothing in Comiskey's letter indicates the sex of persons holding these positions.[9] Comiskey complained:

It is hard to justify the annual compensation for my position at ten thousand dollars less than my peers. Peers who perform an equivalent role to mine. It becomes increasingly difficult to justify my compensation when it is compared to the non-managerial/supervisory positions highlighted above. During my employment review in March, I expressed concerns to Director Richard Marsolais. I communicated to Rich that he needed to address this discriminatory practice. This issue has been brought up several times and continues to be neglected. If wage reduction is not a product of the compensation study I will expect your immediate reappraisal of my position. I am requesting the AIAG to remedy this discriminatory issue by taking the following actions:

Immediately increasing my wages by ten thousand dollars annually. Salary $42,000.00

Retro compensation for the calendar year of 1996 for labor completed. $10,000.00

Retro compensation for the first quarter of 1997

Position and title to be acknowledged as Membership Services Manager

[Defendants' Ex. 22.]

In his letter, Comiskey also accused the A.I.A.G. management of doing a "bad job" of handling sexual harassment training and complaint procedures, and again demanded that the identity of the sexual harassment complainant be revealed. *Id.* He further wrote:

I am beginning to question whether this alleged [sexual harassment] claim exists, or if this might be a tool conjured up by management to suppress male employees from ascending through a female dominated enterprise

*Id.*

On April 30, 1997, Comiskey was disciplined, in part for contents of the letter. Specifically, Comiskey was disciplined because his letter identified the salaries of several other A.I.A.G. employees. Salary information other than information concerning direct subordinates was confidential and Comiskey was not supposed to be in possession of that information. Comiskey claimed that he received the information in error from the controller, but kept the information anyway. The controller, Dawn Savona, denied providing the information to Comiskey.

The preliminary results of the A.I.A.G. compensation study were completed in mid–July 1997. No specifics as to salary or recommended salary adjustments were released to employees.

On August 12, 1997, Director of Operations James Prusak was informed by Troy Haarala, an A.I.A.G. employee, that he had been advised by a co-worker, Betty Carter,

---

**9.** Defendants state in their brief that these positions are held by both male and female employees and, indeed, Plaintiff Comiskey admits in his Response Brief that two of the four management positions with which he was comparing his salary in the letter were at the time (and apparently now still are) held by men. See Plaintiffs' Response Brief, p. 11, n. 14.

that someone was accessing confidential files at one of A.I.A.G.'s two facilities.[10] Prusak immediately began an investigation. Prusak first met with Betty Carter. Ms. Carter told Prusak that Comiskey had obtained confidential information about the preliminary results of the compensation study, had printed off the computer system individual salaries and wage levels of various A.I.A.G. employees, and gave a copy of this print-out to another employee, Lynda Beattie.[11]

Prusak then held a meeting with two of his subordinates in the computer department, Kevin Mitchell and Michael McMullen, to ask for their assistance in investigating the alleged unauthorized access of compensation files. The three of them agreed that such information would likely be on Tammy Dunn's computer in the human resources department. They proceeded to access Dunn's computer to determine whether any files on her computer had been viewed or used recently. Dunn's computer showed that compensation files had been accessed earlier that day, August 12, 1997—a day that Ms. Dunn was on vacation and her office, therefore, unoccupied.

After confirming that Dunn's computer showed that employee compensation files had been accessed, McMullen told Prusak that Comiskey had offered him copies of the compensation files. (Prusak had not told McMullen about Betty Carter's report about Comiskey having print-outs of the files.) Based upon the reports Prusak had received and what their access of Tammy Dunn's computer revealed, Prusak, McMullen and Mitchell agreed to access individual computers of staff after hours to continue their investigation.

Mitchell and McMullen accessed Comiskey's computer after hours on August 12, and by examining a recent documents list on Comiskey's computer, were able to determine that Comiskey had accessed documents on Dunn's computer as well as the files of Dawn Savona and others. Mitchell and McMullen also accessed Lynda Beattie's computer. They were able to determine that Beattie's computer had been used to view confidential files as well. Prusak later learned from another employee, Jennifer Bak, that she observed Rick Comiskey accessing the confidential compensation files at Lynda Beattie's work station. Ms. Bak said that she warned Beattie that she should not allow Comiskey to do this and advised her that Darlene Miller should be notified.

Based on what Prusak had discovered in his investigation, on August 13, 1998, Rick Marsolais, with the concurrence of Darlene Miller and new Executive Director Tom Hoy, discharged Comiskey because of his improper access to confidential files on A.I.A.G.'s computer network—a violation of company policy for which Comiskey had been previously reprimanded.[12]

10. Betty Carter happened to have been Comiskey's first supervisor when he first came to A.I.A.G. and worked in the accounting department. In 1995, early in his second year on the job, Comiskey had complained to his then manager, Beth Baker, about his pay and about company procedures, and alleged that he was being "openly harassed with various gender bias expressions" by Ms. Carter. He, therefore, requested a transfer out of the accounting department. Comiskey believes that Carter falsely accused him of accessing the files to get back at him for his criticism of her two years earlier.

11. Specifically, Ms. Carter told Prusak that she had had a conversation with Lynda Beattie and that Ms. Beattie stated, "Have you seen what Rick took off the system?" and then showed Carter a print-out of individual employee salaries and wage levels. (Beattie stated in her deposition that she and Carter together witnessed Comiskey accessing the information from Beattie's computer.) A.I.A.G. controller, Dawn Savona, also reported to Prusak that Ms. Carter had reported Comiskey's unauthorized access of salary files to her.

12. Lynda Beattie was also disciplined for allowing Comiskey to access her system to obtain the confidential documents. However, unlike Comiskey, who had previously been disciplined for the same violation of policy, Ms. Beattie was not discharged. A third employee, Kent Lenzen, was also disciplined after he reported to Darlene Miller on the day after Comiskey's discharge that Comiskey had also accessed confidential company files from

Despite the fact that at least four employees had reported to management that Comiskey was accessing confidential computer files and the computer trail fully corroborates the employees' reports, Comiskey denies ever having accessed the files. He claims that all of the employees are either being manipulated or are pointing the finger at him to cover their own actions.

## III. PLAINTIFFS' CLAIMS AND DEFENDANTS' SUMMARY JUDGMENT ARGUMENTS

On April 24, 1998, Plaintiffs Juncaj and Comiskey filed the instant Complaint in this court alleging that in terminating their employment A.I.A.G. and Darlene Miller discriminated against them because of their sex—male—and in retaliation for having "opposed what [they each] believed were one or more violations of the state and/or federal civil rights laws" in violation of Title VII of the Civil Rights Act of 1964, as amended and in violation of the Michigan Elliott–Larsen Civil Rights Act.[13]

Plaintiffs present their discrimination claims as "disparate treatment" claims.

Plaintiff Comiskey alleges that he was fired so Rich Marsolais could give his responsibilities to Gayle Lamb, a female towards whom Marsolais displayed an attraction. He also alleges that two female employees, Betty Carter and Lynda Beattie, who had access to salary data, allegedly were "known to have revealed several times confidential salary information to others in the company" but were not disciplined/or not disciplined as harshly as he was.

Plaintiff Juncaj alleges that he was effectively "replaced" as editor of *Action-Line* by Trish Steding by virtue of the fact that the company she went to work for after leaving A.I.A.G. was given the contract to handle the magazine after he was fired.

As for their "retaliation" claims, Comiskey bases his claim on his "wage discrimination" memo of April 19, 1997 and his (anonymous) transmittal of the two Miller e-mails to the Board of Directors. With respect to his reliance on the April 19 memo, Comiskey states that this is a "protected activity" because he was objecting to what he felt were discriminatory differences in salary based on gender. As for his transmittal of the e-mails, he believes that this, too, constitutes a "protected activity" under the civil rights laws, because he was "attempting to expose what [he] perceived was a sexist propensity by Miller which was manifesting itself in unlawful employment practices."

As for Juncaj, he claims that his e-mail "protest" of April 17, 1997 and Defendant Miller's "belief" that he was the person who had anonymously sent the e-mails to the Board of Directors provide the basis for his retaliation claim. With respect to his April 17 e-mail, Juncaj claims that he believed that Miller was engaged in an unlawful employment practice when she falsely accused him of sexual misconduct (i.e., alleging that it was rumored that he was having an affair) with a subordinate and of contributing to sexual harassment. Therefore, he contends that his protestations of her comments qualifies as "protected activity".[14]

Discovery has now closed and Defendants A.I.A.G. and Darlene Miller have each filed a Motion for Summary Judgment.

Defendant A.I.A.G. argues that Plaintiffs have failed to make out legally cognizable claims of reverse sex discrimination

his computer. He was reprimanded for allowing Comiskey to do so.

13. Plaintiffs' each assert a Title VII discrimination and retaliation claim against A.I.A.G. (counts I and II) and also each assert an Elliott–Larsen claim against A.I.A.G. and Darlene Miller (counts III and IV).

14. Since it is undisputed that Juncaj had nothing to do with the sending of the e-mails to the Board of Directors, it is unclear how he could be deemed to have been engaged in a protected activity with respect to those e-mails such that they can provide the basis for his retaliation claim.

under the heightened standards for establishing a *prima facie* case of reverse (i.e., male) sex discrimination set forth in *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir.1994) and *Allen v. Comprehensive Health Services*, 222 Mich.App. 426, 564 N.W.2d 914 (1997), *appeal granted*, —— Mich. ——, 584 N.W.2d 922 (1998), and even if they can establish *prima facie* claims, they cannot rebut the legitimate, nondiscriminatory reasons articulated by A.I.A.G. for their discharge.

Defendant Miller joins in A.I.A.G.'s arguments and, in addition, also argues that this Court should find that the Michigan Supreme Court would hold with respect to the Elliott–Larsen Act, as the Sixth Circuit (and numerous other circuits) did with respect to Title VII that individual supervisory employees are not subject to individual liability under the statute.

With respect to Plaintiffs' retaliation claims, Defendants argue that neither can establish a *prima facie* claim of retaliation since neither of them can establish that they engaged in a legally cognizable "protected activity" or that any alleged protected activity motivated A.I.A.G. to discharge them. Further, as with their discrimination claims, Defendants have proffered legitimate, nonretaliatory reasons for their firings and Plaintiffs cannot present evidence to prove that the articulated reasons were a pretext for illegal retaliation.

## IV. DISCUSSION

### A. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper "'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[15] According to the Celotex Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> * The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> * The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

**15.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding Defendants' motions in this case.

B. *INDIVIDUAL LIABILITY OF SUPERVISOR UNDER THE MICHIGAN ELLIOTT–LARSEN ACT*

Defendants initially argue that Court should find that Michigan's Elliott–Larsen Civil Rights Act does not provide for liability against individual supervisors, and therefore, dismiss Plaintiffs' Elliott–Larsen claims against individual Defendant Miller in Counts III and IV of their Complaint. In making this argument, Defendants rely upon the Sixth Circuit Court of Appeals' ruling in *Wathen v. General Electric Co.*, 115 F.3d 400 (6th Cir.1997). In *Wathen*, the court held that, notwithstanding the language of Title VII, individual supervisors and managers, who do not oth-

erwise qualify as "employers" may not be held liable under the Act.[16] Based upon an examination of the statutory scheme and remedial provisions of Title VII, the *Wathen* court concluded that Congress did not intend to provide for individual employee/supervisor liability under the federal statute. Rather, the court determined that the term "agent" was included in the statutory language merely "to incorporate *respondeat superior* liability into the statute." 115 F.3d at 406.[17]

Because Michigan courts routinely look to federal precedent interpreting Title VII in interpreting the Michigan Elliott–Larsen Civil Rights Act, Defendants argue that this Court should do so now with respect to the issue of an individual supervisor's liability and, by application of *Wathen*, hold that individual employee/supervisors may not be held liable under the Michigan statute. While Defendants have presented a persuasive argument, this Court cannot, as they suggest, simply ignore the fact that the Michigan Court of Appeals has squarely addressed this issue and has held otherwise.

The Elliott–Larsen Act makes it unlawful for an employer to discriminate against employees or applicants for employment on the bases of religion, race, color, national origin, age, sex, height, weight, or marital status. M.C.L. § 37.2202. "Employer" is defined in the state statute as "a person who has 1 or more employees [and] includes an agent of an employer...." Thus, the language of Michigan statute, unlike the Kentucky statute, does not "mirror"

---

**16.** Title VII provides that "it shall be an unlawful employment practice for an *employer* to discriminate on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). A person aggrieved by such discrimination may bring a civil action against the "employer". 42 U.S.C. § 2000e-5(b). "Employer" is defined in the statute as:
   a person engaged in an industry affecting commerce who has fifteen or more employees ... *and any agent of such person.*
   42 U.S.C. § 2000e(b).
   "Agent" is not defined in the Act, but has been interpreted by the courts to mean "an

individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment." *See, Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir.1994).

**17.** The plaintiff in *Wathen* also asserted a claim under the Kentucky Civil Rights Act, KRS Chapter 344. The court found that KRS Chapter 344 "mirrors" Title VII, and therefore, held that its ruling was equally applicable to the Kentucky statute, as well.

the language of Title VII. *See* note 16, *supra.*

▮ The Michigan Court of Appeals construed the language of the Michigan statute in *Jenkins v. Southeastern Michigan Chapter, American Red Cross,* 141 Mich.App. 785, 369 N.W.2d 223 (1985) and explicitly determined that if a person has responsibility for making personnel decisions for the employer, he is an agent within the statutory definition of employer, and therefore, could be held individually liable under the Act. 369 N.W.2d at 230. While it is true that in reaching its decision, the Michigan court relied upon *Munford v. James T. Barnes & Co.,* 441 F.Supp. 459 (E.D.Mich.1977) in which the court held that a supervisor could be individually sued under Title VII, and Munford now has been overruled by *Wathen,* in determining questions of Michigan law, this court nonetheless is bound by decisions of the state's intermediate appellate courts unless it is *convinced* that the Michigan Supreme Court would decide the question differently. *United of Omaha Life Ins. Co. v. Rex Roto Corp.,* 126 F.3d 785, 789 (6th Cir.1997). The Michigan statute was expressly intended to "fill the gap" in Title VII's coverage. Given the fact that Michigan legislature took great pains to expand the coverage of the Elliott–Larsen Act beyond that of Title VII,[18] this Court cannot say that it is "convinced" that the Michigan Supreme Court would construe the Michigan statute as limited by *Wathen.* The Court further notes that two of its colleagues on this bench have also found that *Jenkins* to continue to be good law with respect to individual supervisor liability under the Elliott–Larsen Act even after the Sixth Circuit's decision in *Wathen. See, Hall v. State Farm Ins. Co.,* 18 F.Supp.2d 751, 762–64 (E.D.Mich.1998) (court rejected the defendants' argument that *Jenkins* would be decided differently today by the Michigan courts in light of the Sixth Circuit's *Wathen* decision). *Cf.,*

*Odigbo v. Northwest Airlines, Inc.,* 8 F.Supp.2d 660, 663–66 (E.D.Mich.1998). Sound principles of Federalism caution against this Court reinterpreting Michigan law so as to reject a specific finding by a Michigan appellate court and, arguably undermine a Michigan statute's purpose. Because the Elliott–Larsen Act is obviously an important piece of Michigan legislation, the Court believes if the statute is to be limited, that matter is best addressed by Michigan courts and the Michigan legislature.

Therefore, the Court declines Defendant Miller's invitation to hold that the Sixth Circuit's decision in *Wathen* applies to the Michigan Elliott–Larsen Act. The Court will therefore proceed to discuss the Plaintiffs' claims and the Defendants' arguments for summary judgment on the merits of those claims.

### C. *PLAINTIFFS HAVE FAILED TO MAKE OUT PRIMA FACIE CLAIMS OF REVERSE SEX DISCRIMINATION*

It is well-established that the burden is on the Title VII employment discrimination plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992); *Carden v. General Motors,* 156 Mich.App. 202, 210, 401 N.W.2d 273, 276 (1986), *lv. denied,* 428 Mich. 891, 403 N.W.2d 811 (1987).

If the plaintiff successfully proves a *prima facie* case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas, supra; Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991). Once the employer carries this burden, the

---

**18.** See House Legislative Analysis of House Bill 4055 (proposed House Committee substitute H–6), April 9, 1976; Statement of De- partment of Civil Rights Chairperson before the House Civil Rights Committee, May 28, 1975.

burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. 1089; *Ang v. Procter & Gamble Co., supra.*

Plaintiffs here have presented their sex discrimination claims in this case as "disparate treatment" claims under the framework established by the Supreme Court in *McDonnell Douglas* and *Burdine.* Under the *McDonnell Douglas/Burdine* framework, a plaintiff can establish a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) for the same or similar conduct he was treated differently than similarly-situated non-protected class employees. *Mitchell v. Toledo Hospital, supra*, 964 F.2d at 583; *Ang v. Procter & Gamble Co., supra; Long v. Ford Motor Co.*, 496 F.2d 500 (6th Cir.1974).

■ Consistent with the United States Supreme Court's admonition that the generally-accepted *McDonnell Douglas/Burdine* test for establishing a *prima facie* case of discrimination should be modified to accommodate different employment discrimination contexts,[19] the Sixth Circuit has adopted a test which adds an additional element to the *McDonnell Douglas* paradigm in cases such as this one involving claims of "reverse" sex discrimination. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir.1994). Under the Sixth Circuit's reverse discrimination framework, the reverse sex discrimination plaintiff must show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority" in addition to showing that similarly-situated non-protected class employees were treated differently. *Id. See also, Murray v. Thistledown Racing Club, Inc.*, 770 F.2d

63, 67 (6th Cir.1985) (reverse race discrimination claim). The Michigan Court of Appeals has held that this "heightened" standard of proof is also applicable in reverse sex discrimination cases brought under the Michigan Elliott–Larsen Civil Rights Act. *Allen v. Comprehensive Health Services*, 222 Mich.App. 426, 432–33, 564 N.W.2d 914 (1997), *appeal granted*, —— Mich. ——, 584 N.W.2d 922 (1998).

Although neither the Sixth Circuit nor the Michigan Court of Appeals has provided a precise description of what a plaintiff must prove to establish "background circumstances" essential to a reverse discrimination claim, the Michigan Court of Appeals did cite number of examples of what would constitute such special circumstances in *Allen:*

> For cases in which plaintiffs did establish this first element of their reverse discrimination cases, *see, e.g., Reynolds v. School Dist. No. 1*, 69 F.3d 1523 (10th Cir.1995) (the plaintiff was the only white employee in an otherwise all-Hispanic department and Hispanic supervisors made most employment decisions); *Bishopp v. District of Columbia*, 788 F.2d 781 (D.C.Cir.1986) (the defendant promoted less qualified minority employee; use of subjective rather than objective criteria; internal and external pressure to favor minorities); *Lanphear v. Prokop*, 703 F.2d 1311 (D.C.Cir.1983) (qualified white passed over for black whose qualifications were not fully checked; pressure to increase minority percentages). We ... cite [these Title VII] cases to illustrate the kind of evidence plaintiff might have brought forward, if it had been available, to satisfy the first element of his prima facie case.

222 Mich.App. at 434, n. 6, 564 N.W.2d 914. *See also, Murray v. Thistledown Racing, supra*, 770 F.2d at 68 (suggesting that reverse discrimination plaintiff might have satisfied the "background circumstances"

19. *See, McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824

n. 13, 36 L.Ed.2d 668 (1973).

prong of the test had he been able to show that the employment practices at issue were grounded in an affirmative action program).[20]

■ Applying the foregoing to the facts of this case, although Plaintiffs subjectively allege that A.I.A.G. is a "female dominated employer", they have not presented any evidence to support that allegation. Indeed, the record evidence establishes that the majority of A.I.A.G.'s management is male. All 21 members of the board of directors, the entire five-member executive committee, the Executive Director, and two of the three departmental Directors, including Plaintiffs' immediate supervisor, Richard Marsolais, are male. In terms of upper level management, individual Defendant Darlene Miller and one of the Directors outside of Plaintiffs' department are the only two females. While it may be true that a large percentage of the clerical staff are female, it is undisputed that these lower level employees had nothing to do with company policy, hiring, firing, discipline, or organizational management decisions. Further, the fact that Plaintiffs' supervisor, Richard Marsolais, was allegedly "known to demonstrate an attraction for female subordinates" [Plaintiffs' Response Brief at 22] is not relevant to the reverse discrimination background circumstances analysis.

Because Plaintiffs cannot establish sufficient background circumstances showing that A.I.A.G. is the "unusual employer who discriminates against males," neither of them has established a *prima facie* case of reverse sex discrimination.

However, even assuming *arguendo* that Plaintiffs had presented sufficient evidence of background circumstances of female domination at A.I.A.G., they nonetheless would be found to have failed to make out *prima facie* claims of sex discrimination.

As indicated, Plaintiffs Juncaj and Comiskey have presented their discrimination claims as "disparate treatment" claims. A disparate treatment plaintiff can establish a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) for the same or similar conduct he was treated differently than similarly-situated non-protected class employees.

The third and fourth elements—i.e., showing that the plaintiff was qualified for the position and showing that for the same or similar conduct he was treated differently than similarly-situated non-protected class employees—are intertwined.

■ In order to show that he was "qualified", an employment discrimination plaintiff must show that he was performing his job to his employer's satisfaction. *Ang v. Procter & Gamble Corp., supra,* 932 F.2d at 549; *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1160 (6th Cir.1990). A plaintiff cannot create an issue of fact by challenging the judgment of his supervisors, or by questioning the soundness of an employer's business decision. *Id.* Where a plaintiff fails to establish that his qualifications were similar to the qualifications of non-protected class employees, summary judgment in favor of the defendant-employer is proper. *Wilson v. Communications Workers of America,* 767 F.Supp. 304, 307 (D.D.C.1991).

20. Although Plaintiff argues that the Court should disregard the requirement of this additional "background circumstances" element because although the Sixth Circuit specifically has required satisfaction of this additional requirement in a number of cases dating back to 1985, in *Pierce,* the Court stated in a footnote that this element has been criticized by some courts as impermissibly imposing a "heightened standard" upon reverse discrimination plaintiffs and that it had "serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their nonwhite or female counterparts." 40 F.3d at 801 n. 7. While this Court may share the *Pierce* court's concerns, the fact remains that the additional "background circumstances" element remains the law of this Circuit and this court, accordingly, is not at liberty to disregard it.

With respect to the fourth element, i.e., showing that for the same or similar conduct the plaintiff was treated differently than similarly-situated non-protected class employees, the Sixth Circuit has set forth the following requirements for establishing the "comparable" nature of the non-protected class employees:

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects. Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards *and have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987); *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir. 1988) (plaintiff must prove that he and the white employee were similarly situated in all respects *and that the other employee's acts were of comparable seriousness to his own*); *Cox v. Electronic Data Systems Corp.*, 751 F.Supp. 680 (E.D.Mich.1990).

*Mitchell v. Toledo Hospital, supra*, 964 F.2d at 583 (some emphasis added.)

In *Mitchell*, the court found no error in the District Court's granting of the defendant's motion for summary judgment because the plaintiff failed to produce sufficient affirmative evidence to establish that one comparable's alleged absenteeism and the other comparable's insubordination were of "comparable seriousness" to the conduct (misuse of hospital property) for which she was discharged.

Applying the foregoing standards to the facts of this case, the Court finds that Plaintiffs have not established that the female employees with whom they compare their treatment, were "similarly-situated in all respects."

▮ Plaintiff Comiskey seeks to compare his treatment to that of Gayle Lamb. According to Comiskey, Richard Marsolais "displayed an attraction" for Ms. Lamb, who was one of Comiskey's subordinates. After he was fired, Comiskey claims that Marsolais gave Lamb most of his former responsibilities and urged her to apply for the position once it was posted, even though, according to Comiskey, Ms. Lamb was less qualified than he was for the job. Because Comiskey claims he was better qualified for the position than Lamb, he contends that Marsolais' assigning Lamb his duties after he was terminated establishes differential treatment of similarly-situated employees.

As an initial matter, the record evidence shows that Ms. Lamb did *not* replace Mr. Comiskey. Lamb was temporarily given a "major share" of Comiskey's duties until Comiskey's job was posted. [See Statement of Gayle Lamb, ¶ 3, Plaintiff's Ex. 37.] Although Lamb did apply for the job once it was posted, she left A.I.A.G. before the position was filled. *Id.*

To the extent that Comiskey attempts to make out a comparison between himself and Lamb as his replacement, however, there is no competent evidence of record supporting Comiskey's allegation that he was more qualified to perform the responsibilities of his former job than Ms. Lamb. The only "evidence" supplied by Comiskey in support of this contention is Comiskey's post-deposition, post-summary judgment motion affidavit [Plaintiff's Ex. 25] which contains only his personal subjective belief that he was more qualified than Lamb. *Id.* at ¶ 3. It is well-settled that conclusory allegations in an affidavit do not create specific fact disputes sufficient to defeat summary judgment. *See, Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir.1990) ("Although the nonmov-

ing party's evidence in opposition to summary judgment need not be of the sort admissible at trial, he must employ proof *other than his pleadings and own affidavits* to establish the existence of specific triable facts." *Id.,* citing *Celotex v. Catrett, supra.* (emphasis added).)

More importantly, Comiskey has not shown that Lamb and he were "similarly-situated **in all respects**", i.e, he has not shown that Lamb engaged in the same conduct for which Comiskey was fired. Indeed, there is absolutely no evidence that Lamb at any time improperly accessed confidential salary records.

■ Comiskey also compares his discharge for improperly accessing confidential salary records to the treatment afforded Betty Carter. Comiskey alleges that Ms. Carter "revealed salary information about other employees to persons who did not have a legitimate right to that information", when he worked in Carter's department (i.e., at some unspecified point between 1993 and 1996), but "to [his] knowledge," Carter was not disciplined for it. Even assuming the truth of Comiskey's allegation, as with Ms. Lamb, Comiskey cannot show that he and Carter were "similarly-situated in all respects." Carter worked in a different department than Comiskey and, at the time when she allegedly revealed salary information to other employees, answered to an entirely different management team. There is no evidence that prior management even knew of the conduct which Plaintiff charges Carter.

■ Comiskey also attempts to cast Lynda Beattie as a "comparable" claiming that Ms. Beattie, who was disciplined for her activities in connection with Comiskey's August 1997 unauthorized accessing of confidential files, was not as severely disciplined as he was—she was issued a written reprimand, he was discharged. However, Comiskey has presented no evidence to establish that Beattie was disciplined previously for violating company policy regarding confidential salary records. By contrast, Comiskey was repri-

manded previously for the very same conduct which gave rise to his termination. Four months earlier, he was reprimanded for obtaining confidential salary records and warned that future similar improper conduct would result in further disciplinary action "up to and including termination." [See Defendants' Ex. 23.] Thus, Comiskey has not established that he and Beattie engaged in the same conduct "without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."

■ With respect to Plaintiff Juncaj, he attempts to make out his *prima facie* claim by comparing his treatment to that of Trish Steding who he claims was his *de facto* replacement by virtue of the fact that the company she went to work for after leaving A.I.A.G. was retained to handle the organization's magazine, *ActionLine.* Because Juncaj claims that he was better qualified than Steding, he claims that because she allegedly was given *ActionLine*'s editing duties after he was fired, he has presented a *prima facie* case of discrimination. Even assuming *arguendo* that A.I.A.G. specifically gave Steding, not the company she worked for, Juncaj's editorial duties, like Plaintiff Comiskey, Plaintiff Juncaj has presented no evidence to show that he and Steding were "similarly situated in all respects". Steding did not insult or demean A.I.A.G. management as Comiskey did with Darlene Miller or otherwise engage in similar insubordinate conduct.

For all of the foregoing reasons, the Court finds that neither Plaintiff Comiskey nor Plaintiff Juncaj has made out a *prima facie* case of reverse sex discrimination.

D. *DEFENDANT HAS SET FORTH LEGITIMATE, NON–DISCRIMINATORY REASONS FOR THE TERMINATION OF PLAINTIFFS' EMPLOYMENT*

Even if Plaintiffs could establish a *prima facie* case of reverse sex discrimination, their claims still must fail because

Defendants have proffered legitimate, non-discriminatory reasons for their firing—Juncaj was fired for insubordinate, unprofessional conduct "out of line for management", and Comiskey was fired for unauthorized access of confidential computer records—and Plaintiffs have not established that the reasons given for their firing were but a pretext to hide unlawful discrimination.

■ An employee can show pretext by offering evidence that the employer's proffered reason has no basis in fact, did not actually motivate its decision or was never used in the past to discharge an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir.1998).

■ Plaintiff Comiskey argues that one of the informants against him was Betty Carter, his former supervisor whom Plaintiff claims was out to get him because of his prior complaints about her to management. He claims that James Prusak, who conducted the investigation concerning the improper accessing of confidential computer files, was aware of the animosity between Comiskey and Carter. Therefore, Comiskey claims that Prusak and A.I.A.G. should have doubted the information she provided.

Plaintiff's argument overlooks the fact that information provided by Ms. Carter was not the only evidence which A.I.A.G. had to go on in concluding that Comiskey had improperly accessed/obtained confidential computer records of employee salaries. In addition to Ms. Carter (and Lynda Beattie and Dawn Savona who recounted to Prusak what Carter related), at least other three employees who personally observed Comiskey either accessing confidential computer files or having the salary records in his possession—Jennifer Bak, Kent Lenzen and Michael McMullen—had reported that Comiskey was accessing confidential computer files. Further, the computer trail investigated by McMullen and Kevin Mitchell fully corroborates the employees' reports.

■ Moreover, as the Seventh Circuit observed in *Kariotis v. Navistar Interna-*

*tional Transportation Corp.*, 131 F.3d 672, 677 (7th Cir.1997), "the question is not whether the employer's reasons are *right,* but whether the employer's description of its reasons is *honest.*" Thus, arguing that the employer could have done a better investigation is irrelevant. "[A] reason honestly described but poorly founded"—so long as it has *some* basis in fact—"is not a pretext as that term is used in the law of discrimination." *Id.,* (quoting *Pollard v. Rea Magnet Wire Co.*, 824 F.2d 557, 559–61 (7th Cir.1987), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987)). *See also, Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir .1991) ("We can assume for purposes of this opinion that the complaining employees interviewed by [defendants] were lying through their teeth. The inquiry ... is limited to whether [defendants] *believed* that [plaintiff] was guilty.")

Here, Defendants had ample factual basis for concluding that Plaintiff Comiskey had improperly accessed the confidential files and motivated by its findings, terminated Plaintiff's employment.

■ Plaintiff Juncaj's only purported evidence of pretext is that what he said in his April 17, 1997 e-mail to Miller did not amount to "insubordination" because he was not disobeying any directive to refrain from sending such messages. It is, however, the employer's prerogative to determine what behavior it will allow and which behavior it will deem unacceptable, as well as to determine what punishment it believes is appropriate for violations of those standards of behavior. *Reynolds v. Humko Products,* 756 F.2d 469, 472 (6th Cir. 1985); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir.1990) (to establish pretext, it is not enough to show that the employer made a poor business decision). Furthermore, at his deposition, Juncaj admitted that he knew that his behavior towards A.I.A.G.'s management was inappropriate and that he fully expected to be disciplined for sending the e-mail. [Juncaj Dep. pp. 159–160.]

Based upon the foregoing, the Court finds that Plaintiffs have not established that Defendants' proffered reasons for their discharge were merely a pretext for unlawful discrimination.

For all of these reasons, Defendants' Motions for Summary Judgment will be granted on Plaintiffs' reverse sex discrimination claims.

### E. PLAINTIFFS HAVE FAILED TO ESTABLISH LEGALLY COGNIZABLE CLAIMS OF RETALIATION

Plaintiffs also claim that they were terminated in retaliation for engaging protected opposition activities.

In order to state a claim of retaliation under Title VII, a plaintiff must establish:

1. That he participated in a protected activity;

2. That the company was aware of his participation;

3. That the company subsequently took action adverse to plaintiff; and

4. That there is a causal connection between the protected activity and the adverse employment action.

*Canitia v. Yellow Freight System,* 903 F.2d 1064, 1066 (6th Cir.1990), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990).[21] Plaintiff has the ultimate burden of proving that the complained of adverse employment action would not have occurred if he had not engaged in the protected activity. *Id.* at 583.

Both Title VII and the Michigan Elliott–Larsen Civil Rights Act prohibit retaliatory conduct by an employer in two situations: (1) when an employee has made a charge of discrimination, filed a complaint of discrimination, or otherwise participated in enforcement proceedings ("the participation clause"); or (2) when an employee "has opposed a violation [of the Act]" (the "opposition clause"). *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1312 (6th Cir.1989). As the Sixth Circuit observed in *Booker,* "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings." *Id.* The "exceptionally broad protection" of the participation clause extends to persons who have "participated in any manner" in Title VII proceedings. *Id.* On the other hand, "the opposition clause" does not protect all "opposition" activity. In opposition cases, courts are required "to balance the purpose of the Act to protect persons engaging reasonably in activities opposing discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." *Id.* (citations omitted). Thus, as the *Booker* court noted,

> There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered.... [Thus, a]n employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employers goals.

879 F.2d at 1312 (citations omitted).

Plaintiffs here do not contend that they were engaged in "participation" activities;

---

**21.** A higher standard is required to make out a *prima facie* case of unlawful retaliation under the Michigan Elliott–Larsen Act. To make out a claim under the Michigan Act requires that the plaintiff establish (1) that he opposed violations of the Act or participated in activities protected by the Act, and (2) that the opposition or participation was a *significant factor* in the adverse employment decision.

*Booker v. Brown and Williamson,* 879 F.2d 1304, 1310 (6th Cir.1989). The *significant factor* standard "requires a showing of more than a 'causal link.' A factor can be a 'cause' without being 'significant.' Only the latter is sufficient to show retaliatory discharge." *Id.,* quoting *Polk v. Yellow Freight System, Inc.,* 801 F.2d 190, 199 (6th Cir.1986).

rather, as indicated, they claim they were retaliated against for engaging in "opposition" activities. Therefore, their claims will be evaluated under the above-quoted standards.

■ In order to engage in a protected opposition activity under Title VII or Elliott–Larsen, a plaintiff must make an overt stand against suspected illegal discriminatory action. *Booker v. Brown and Williamson, supra.* "[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination." *Id.,* 879 F.2d at 1313.

Plaintiff Juncaj cannot point to any action on his part that is arguably opposition activity. Juncaj bases his retaliation claim upon an assertion that he believed his complaints to A.I.A.G. management that he was being "falsely" accused of contributing to a sexually harassing work environment constitutes protected opposition activity. First, as Juncaj admitted in his deposition, his frequent, open discussions with a subordinate about sex and his open sexual jokes in management meeting minutes were improper. [Juncaj Dep. pp. 64, 79, 90.] Therefore, his complaints that he was being "falsely" accused are specious.

■ Second though Juncaj may have subjectively believed that he was engaging in protected activity in complaining to his superiors that he was being wrong-

fully accused of contributing to a sexually hostile atmosphere, the fact is that he was not. In order to engage in a "protected activity", a plaintiff must actually oppose activity that, if true, would be a violation of the civil rights laws. *Booker, supra.* Juncaj's complaint about being unfairly accused does not amount to opposing practices made illegal by Title VII or the Elliott–Larsen Act. *See also, Godon v. North Carolina Crime Control,* 1998 WL 193109, 1998 U.S.App. LEXIS 7832 (4th Cir.1998) (plaintiff who disagreed with disciplinary practices and issued complaints to that effect did not engage in protected activity under Title VII).

■ The same is true of Plaintiff Comiskey's claim. Comiskey bases his claim first on his April 19, 1997 memo in which he charged "wage discrimination" amongst various positions held by both males and females at A.I.A.G. As the Sixth Circuit made clear in *Booker,* "a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice." 879 F.2d at 1313. The *Booker* court explained:

An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of "discrimination." In our view, such would constitute an intolerable intrusion into the workplace.

*Id.*[22]

■ Similarly, Comiskey's reliance on his anonymous sending of Darlene Miller's

22. Furthermore, Comiskey's April 1997 memorandum was remote in time in relation to his discharge. The letter was sent to A.I.A.G.'s Human Resources Director four months prior to his termination. Because a temporal connection between his letter and his discharge is lacking, Comiskey is unable, as a matter of law, to satisfy the fourth element of a *prima facie* case, i.e., he cannot show that there is a causal connection between the alleged protected activity and the adverse employment action he complains of. *See, Booker, supra,*

879 F.2d at 1314 (no causal connection between plaintiff's letter and his demotion where letter he was not demoted until a month after his letter); *Cooper v. City of North Olmsted,* 795 F.2d 1265, 1272 (6th Cir.1986) (no causal link between filing of civil rights charge and plaintiff's discharge where charge was filed four months before discharge); *Brown v. ASD Computing Center,* 519 F.Supp. 1096, 1116 (S.D.Ohio 1981) (plaintiff failed to make out a *prima facie* case of retaliatory

e-mails to the Board of Directors does not constitute protected activity. Indeed, nowhere in the e-mails is there any allegation of discrimination. The only evidence was that the e-mails were being sent to the Board in an attempt to embarrass Miller. Furthermore, it is undisputed that A.I.A.G. did not know who sent the e-mails to the Board members (and, in fact, suspected that it was Juncaj) until Comiskey admitted more than a year after his discharge in his September 1998 deposition in this case that he was the person who had sent them. Where, as here, it is established that the defendant employer did not know of the plaintiff's involvement in an activity purportedly protected by Title VII, no *prima facie* case of retaliatory discharge is established. *See Brown v. ASD Computing Center, supra,* 519 F.Supp. at 1115.

However, even assuming *arguendo* that Comiskey and Juncaj have succeeded in making out *prima facie* claims of retaliation, as discussed above in this Opinion, A.I.A.G. has established legitimate non-retaliatory reasons for discharging Plaintiffs. Juncaj was discharged for insubordination or "conduct out of line for management" after a series of inflammatory e-mails regarding his opposition to the company's requirement that he post an open position. Comiskey was discharged for accessing confidential information on A.I.A.G.'s computer system after having been previously warned not to do so. As discussed at length, *supra,* neither Juncaj nor Comiskey can establish that these legitimate, non-retaliatory reasons are pretextual.

For these reasons, the Court will grant Defendants' Motions for Summary Judgment on Plaintiffs' retaliation claims, as well.

### CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Defendant A.I.A.G.'s and Defendant Darlene Miller's separately filed Motions for Summary Judgment be, and hereby are, GRANTED.

Accordingly,

IT IS FURTHER ORDERED that all of Plaintiffs' claims in this action be, and hereby are, DISMISSED with prejudice.

discharge where her discharge occurred three months after she announced her intention to consult with the EEO and four months after she was advised to contact the EEO office.)