**E. Marie HOLDEN, Plaintiff-Appellee (85–3405), Plaintiff-Appellant (85–3420),**

v.

**OWENS–ILLINOIS, INC., Defendant-Appellant (85–3405), Defendant-Appellee (85–3420).**

**Nos. 85–3405, 85–3420.**

United States Court of Appeals, Sixth Circuit.

Argued May 8, 1986.
Decided June 18, 1986.

Harland M. Britz, argued, Britz & Zemmelman, Toledo, Ohio, for E. Marie Holden.

R. Jeffrey Bixler, Owens-Illinois, Inc., Toledo, Ohio, Lloyd Sutter, argued, King & Spalding, Atlanta, Ga., for Owens-Illinois, Inc.

Before KENNEDY and MILBURN, Circuit Judges, and JOINER, Senior District Judge.*

CORNELIA G. KENNEDY, Circuit Judge.

Owens-Illinois, Inc. ("Owens") appeals and E. Marie Holden ("plaintiff") cross-appeals from the judgment for plaintiff in this employment discrimination action. During the summer of 1975, Owens recruited plaintiff to manage the company's affirmative action programs and to design and implement affirmative action plans that would comply with Exec. Order No. 11,246, 30 Fed.Reg. 12,319 (September 24, 1965), *reprinted in* 42 U.S.C. § 2000e note, *as amended* ("Executive Order No. 11,246"). Plaintiff eventually accepted the position and agreed to commence employment on October 1, 1975. After approximately six weeks, Owens terminated plaintiff's employment on November 11, 1975. The District Court held that Owens discharged plaintiff because she aggressively sought to do her job and that the discharge violated 42 U.S.C. § 2000e–3(a), the "opposition clause" in Title VII of the Civil Rights Act of 1964 ("Title VII"), *as amended,* 42 U.S.C. § 2000e. We hold that plaintiff's attempts to implement affirmative action plans which would comply with Executive

Order No. 11,246 do not qualify as protected activity under the opposition clause. We also hold that the District Court did not err in dismissing plaintiff's state law claim for wrongful discharge. Accordingly, we reverse the judgment for plaintiff on the "opposition clause" claim and remand the case to the District Court with instructions to dismiss plaintiff's complaint.

Plaintiff commenced this action on September 2, 1976 in the United States District Court for the Northern District of Ohio. Plaintiff's complaint alleged diversity of citizenship and asserted a claim under state law for "fraudulent representation." Joint Appendix at 8. Plaintiff filed an amended complaint on February 15, 1977 which added a claim alleging that Owens' termination of her employment violated Title VII. Plaintiff's amended complaint alleged that "her firing was racially motivated, in that the plaintiff was a black woman, insisting on compliance by the defendant with Title VII, and furthermore that her firing was retaliatory in that it resulted from plaintiff's insistence upon the company's compliance with Title VII...." Joint Appendix at 20. Plaintiff's pre-trial brief, however, clarified her federal claim:

> The court will note that we have not pleaded that the plaintiff was fired because she was a black female. We are pleading, rather, that defendant's discharge was "in retaliation" for plaintiff's proper use of Title VII, thereby falling under the express provisions of Title 42 US Code § 2000e–3 [sic] which provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter ..." We believe that this language means just what it says.

Joint Appendix at 31.

The District Court conducted a bench trial over three and one-half non-consecutive days in September and October, 1981.

---

* The Honorable Charles W. Joiner, Senior Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

At the close of plaintiff's evidence, Owens moved for an involuntary dismissal under Fed.R.Civ.P. 41(b). Owens argued that plaintiff did not make out a claim under 42 U.S.C. § 2000e–3(a) because Title VII did not cover plaintiff's opposition to Owens' employment practices. The District Court reserved its ruling on the motion, which Owens renewed at the close of all the evidence.

On July 25, 1984, or almost three years after the trial, the District Court rendered its decision on the question of liability. Initially, the District Court concluded that since plaintiff's employment contract was of indefinite duration, the employment contract was terminable at will. Accordingly, the District Court ruled for Owens on the state law cause of action and granted Owens' Fed.R.Civ.P. 41(b) motion on that claim. On the federal claim, the District Court found that:

> There is no doubt in the Court's mind that at the time the defendant employed the plaintiff, its employment practices were in many respects discriminatory, especially as to race, but also as to gender. It had been following the common practice of window-dressing by token employment of minority individuals, rather than seriously trying to change its methods and to remedy the results of its past discriminatory actions. When the plaintiff, perhaps with more zeal than good judgment, moved aggressively to try to get action, she was summarily discharged.

Joint Appendix at 61. The District Court awarded plaintiff full back pay, holding that although plaintiff had earned less than $1,000 during the eight and one-half years since Owens terminated her employment, Owens had failed to prove a lack of mitigation. The District Court instructed the parties to meet and attempt to agree on the appropriate amount of back pay. The District Court also awarded reinstatement even though, as the District Court expressly acknowledged, plaintiff had not requested reinstatement in her prayer for relief.

Although the parties stipulated to several matters affecting the computation of back pay, the parties could not agree as to the appropriate treatment for income taxes and lost pension benefits. Consequently, the District Court held a hearing on those issues affecting damages on December 12, 1984. Plaintiff claimed that she would have to pay more income taxes on the lump-sum back pay award than she would have had to pay if she had received her wages on an annual basis. Accordingly, plaintiff requested an addition to the amount of damages to compensate her for this increased tax liability. Plaintiff also requested monetary compensation in lieu of pension credit. The District Court refused to increase the amount of damages to compensate plaintiff for increased income taxes and awarded pension credit rather than the dollar value of her lost pension benefits. On March 29, 1985, the District Court issued an order entering judgment against Owens. On April 24, 1985, the District Court amended the previous order to enter a judgment against defendant for $372,-279.45. On May 9, 1985, the District Court, sua sponte, entered an order to correct a clerical mistake in the April 24, 1985 order and amended the order by changing the amount of the judgment to $361,835.45.

This appeal and cross-appeal raise seven issues: (1) Whether plaintiff's actions seeking to implement an affirmative action program that would comply with Executive Order No. 11,246 qualified as protected conduct under 42 U.S.C. § 2000e–3(a); (2) Whether the District Court abused its discretion in excluding as irrelevant: (a) evidence that a previous employer terminated plaintiff for reasons similar to those that defendant gave for plaintiff's termination; and (b) evidence that plaintiff physically assaulted another employee shortly before defendant terminated plaintiff's employment; (3) Whether the District Court's conclusion that defendant terminated plaintiff for engaging in protected conduct is clearly erroneous or erroneous as a matter of law; (4) Whether the District Court erred in granting plaintiff reinstatement to her previous position even though plaintiff did not

request such relief in her pleadings or at trial; (5) Whether the District Court erred in dismissing the claim for wrongful discharge under Ohio law; (6) Whether the District Court erred in denying plaintiff additional damages for the tax effect of receiving a large sum of back pay in one year; and (7) Whether the District Court erred in granting plaintiff pension credit rather than the cash equivalent of defendant's contribution to the pension. For the reasons stated below, we hold that plaintiff's actions seeking to implement an affirmative action program which would comply with Executive Order No. 11,246 do not qualify as protected conduct under 42 U.S.C. § 2000e–3(a) and that the District Court erred, as a matter of law, in concluding that defendant terminated plaintiff's employment because she engaged in protected conduct. Finally, we hold that the District Court did not err in dismissing plaintiff's state law claim for wrongful discharge. Accordingly, we reverse the judgment for plaintiff and remand the case to the District Court with instructions to dismiss plaintiff's complaint. In light of this disposition, we need not and do not address the remaining issues.

### I.

Title 42 U.S.C. § 2000e–3(a)[1] contains two separate clauses which prohibit an employer from retaliating against an employee—an "opposition clause," which prohibits discrimination or retaliation against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII]," and a "participation clause," which prohibits discrimination or retaliation against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See Sias v. City Demonstration Agency*, 588 F.2d 692,

694 (9th Cir.1978). Although plaintiff filed a discrimination charge against Owens the day before the company terminated her employment, plaintiff has not alleged that Owens fired her because she filed a discrimination complaint. Consequently, this case involves the "opposition clause."

■ Owens argues that the District Court erred as a matter of law, and as a matter of fact, in concluding that Owens terminated plaintiff's employment because she opposed certain employment practices that violated Title VII. Although the District Court's opinion contains the following language, the District Court did not make any specific findings regarding the violations of Title VII that plaintiff "opposed."

> [P]laintiff was discharged because she vigorously opposed what she perceived to be violations of Title VII. There is no doubt that her perceptions were based in fact. This Court has little difficulty concluding that her conduct was protected conduct within the meaning of Title VII, and has even less difficulty concluding that but for her willingness and attempts to do her job effectively she would not have been discharged.

Joint Appendix at 65. A complete reading of the transcript, the record, and the District Court's opinion in this case indicates that the District Court treated plaintiff's aggressive attempts to implement affirmative action plans that would comply with Executive Order No. 11,246 as the "opposition" in this case.

Owens argues that even if it terminated plaintiff's employment because she aggressively and zealously sought to implement an affirmative action plan which would comply with Executive Order No. 11,246, plaintiff's actions did not constitute protected conduct. We agree. On its face, 42 U.S.C. § 2000e–3(a) only protects "opposition" to employment practices that violate

---

1. Title 42 U.S.C. § 2000e–3(a) provides in pertinent part:

    It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlaw-

ful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Title VII. Although Executive Order No. 11,246 requires government contractors to establish affirmative action programs,[2] Title VII does not mandate the implementation of affirmative action. 42 U.S.C. § 2000e–2(j) provides in pertinent part:

Nothing contained in this subchapter shall be interpreted to require any employer ... to grant preferential treatment to any individual or to any group because of the race, color, religion, sex, or national origin of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, religion, sex, or national origin employed by any employer ... in comparison with the total number or percentage of persons of such race, color, religion, sex, or national origin in any community, State, section, or other area, or in the available work force in any community, State, section, or other area.

In *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 259, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981), the Supreme Court stated: "Title VII, however, does not demand that an employer give preferential treatment to minorities or women." *See also United Steelworkers of America, AFL–CIO–CLC v. Weber*, 443 U.S. 193, 205–07, 99 S.Ct. 2721, 2728–29, 61 L.Ed.2d 480 (1979). Since Title VII does not require the adoption of affirmative action programs, to the extent that plaintiff

sought to implement an affirmative action plan which would comply with Executive Order No. 11,246, plaintiff was not opposing a practice that violated Title VII. Consequently, the District Court erred in treating plaintiff's attempts to implement an affirmative action program which would comply with Executive Order No. 11,246 as protected conduct under the "opposition clause."

As we have previously mentioned, the District Court did not identify any specific conduct which might have constituted "opposition" within the meaning of 42 U.S.C. § 2000e–3(a). Furthermore, the District Court did not identify any conduct of defendant which violated Title VII. In response to a question from the bench at oral argument, however, plaintiff's counsel claimed that plaintiff presented evidence that, in at least two instances, she "opposed" conduct that violated Title VII. First, counsel stated that plaintiff testified that she informed John Chadwell, the Director of Human Resources, and Clint Wagner, the Personnel Manager, that the substantial concentration of minorities in a nonsupervisory job category in the mail room violated Revised Order No. 4.[3] Since Revised Order No. 4 implements Executive Order No. 11,246, however, plaintiff was not opposing conduct that violated Title VII in complaining about conditions in the mail room.[4]

**2.** Section 202 of Executive Order 11,246 provides in pertinent part:

Except in contracts exempted in accordance with Section 204 of this Order, all Government contracting agencies shall include in every Government contract hereafter entered into the following provisions:

"(1) The contractor will not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin...."

**3.** Revised Order No. 4, 41 C.F.R. §§ 60–2.1–60–2.32 (1985), is an order issued by the Office of

Federal Contract Compliance Programs pursuant to Executive Order No. 11,246 and sets forth the procedures and standards governing the formulation of affirmative action programs by nonconstruction federal government contractors. *See* B. Schlei & P. Grossman, *Employment Discrimination Law*, 1273 n. 13 (2d ed. 1983).

**4.** Although 42 U.S.C. § 2000e–2(a)(2) makes it "an unlawful employment practice ... to ... segregate ... employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin," plaintiff made her complaint about the mail room in terms of Revised Order No. 4 and there was no evidence that the large number of minorities working as mail handlers violated 42 U.S.C. § 2000e–2(a)(2).

Second, counsel noted that plaintiff testified that she complained to Chadwell and Phil Anthony, her immediate supervisor, that several employees told her that Owens was passing over minorities and women for promotions. Plaintiff testified that, shortly after Owens circulated a memo announcing her hiring, several minority women complained to her that they had frequently been passed over for promotions. Two women in particular—one was a sophomore in college and the other may have been a freshman who was going to college at night, complained that they had applied for posted jobs that would have been promotions but they did not even get the courtesy of an interview to compete for the positions. Plaintiff testified that Chadwell told her that he was not going to get involved in the matter and told her to "Forget it." Nonetheless, plaintiff testified that she asked Wagner, the personnel manager, if he would do her the favor of talking to the two women and he said that he would. Plaintiff testified that Wagner met with the two women, but that the day after the meeting, the company removed the posting and informed the applicants that the job was nonexistent. Plaintiff testified that two days later, however, the position was again posted with the additional requirement of a college degree. Plaintiff did not complain about the manner in which Wagner handled the matter. Although such complaints would qualify as protected activity, there is no evidence that the complaints were a cause of plaintiff's discharge. Wagner did not participate in the decision to discharge plaintiff. There is no evidence that either Chadwell or Anthony knew of plaintiff's later efforts on behalf of the two women. In light of the timing of plaintiff's termination, which occurred immediately after her trip to the Shreveport, Louisiana plant, we can find no evidence that plaintiff's complaints that the company was passing over women and minorities for promotions was a cause for the termination.

Early in plaintiff's employment, Anthony asked plaintiff to critique the affirmative action plan for the company's Bridgeton, New Jersey plant to ensure that the plan complied with Revised Order No. 4. Plaintiff subsequently told Anthony that she could not do the critique because she could not verify the numbers without actually visiting the plant. Plaintiff suggested that she visit a plant and put a plan together from scratch so that Owens would have a model for other plants. Anthony agreed and arranged a trip for plaintiff to the Shreveport plant, which did not have an affirmative action plan because it was a new facility.

Upon her arrival at the Shreveport plant, plaintiff requested various information. Although plaintiff complained that the plant did not give her the information that she needed, the only specific information that plaintiff testified that the plant did not give her was a salary key to enable her to determine the salaries of the plant's employees. Plaintiff, however, acknowledged that she received a memorandum which included a listing of points and rate groups for particular jobs. Although plaintiff testified that she could not remember whether a salary key was attached to the memorandum, both the plant personnel director, Larry Joe Stump, and Virginia Phelps, Stump's secretary, testified that they gave plaintiff the salary key and a copy of the labor agreement. When Stump refused to permit plaintiff to interview employees who had filed discrimination charges against the company, plaintiff called Anthony in Toledo to seek his support. Anthony told plaintiff that her job did not require her to contact those employees and that if she did the employees could accuse the company of retaliating against them. Eventually, the Shreveport plant manager, Robert Falter, complained to Anthony that plaintiff was unreasonable, uncooperative, and demanding and that she acted like a compliance officer rather than like a person sent down there to give technical assistance. Consequently, Anthony recalled plaintiff to Toledo. Although Anthony told plaintiff to go ahead with a meeting that plaintiff had scheduled with community leaders and Stump, plaintiff cancelled the meeting.

Anthony also instructed plaintiff to return to Toledo immediately so that she would be in the office the next day to meet with him because he would be out of town on Thursday and Friday of that week. Plaintiff did not return to Toledo until the following day because she felt tired. Furthermore, she did not go to the office until Thursday when Anthony was already out of town. Once in the office, she sent a memo to Anthony, Chadwell, and J.W. Hanlon, Jr., Chadwell's supervisor.

Although courts should liberally construe the "opposition clause," *see Sias v. City Demonstration Agency, supra* at 695, 42 U.S.C. § 2000e–3(a) does not protect all "opposition" activity. In *Hochstadt v. Worcester Foundation for Experimental Biology,* 545 F.2d 222 (1st Cir.1976), the First Circuit stated:

> [W]e think courts have in each case to balance the purpose of the Act to protect persons engaging reasonably in activities opposing ... discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel.... The requirements of the job and the tolerable limits of conduct in a particular setting must be explored. The present case, therefore, raises the question, put simply, of whether plaintiff went "too far" in her particular employment setting.

*Id.* at 231 (footnote omitted). In *Rosser v. Laborers' International Union,* 616 F.2d 221 (5th Cir.), *cert. denied,* 449 U.S. 886, 101 S.Ct. 241, 66 L.Ed.2d 112 (1980), the Fifth Circuit stated:

> Even though opposition to an unlawful employment practice is protected, such protection is not absolute. There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered by § 704(a).

*Id.* at 223 (citations omitted). *See also EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1014–16 (9th Cir.1983). *Cf. Brown v. Ralston Purina Co.,* 557 F.2d 570, 572 (6th Cir.1977) ("an EEOC complaint creates no right on the part of an employee to miss work, fail to perform assigned work, or leave work without notice") ("participation clause").

An employee does not receive special protection under Title VII simply because the employee handles discrimination complaints or works on affirmative action matters. In *Whatley v. Metropolitan Atlanta Rapid Transit Authority,* 632 F.2d 1325 (5th Cir. 1980), the Fifth Circuit held that 42 U.S.C. § 2000e–3(a) does not prevent an employer from dismissing an employee who handles discrimination complaints as part of his job when the employee handles those complaints contrary to the instructions of the employer. The Fifth Circuit affirmed, as not clearly erroneous, the district court's findings that appellant's "dismissal was a culmination of problems growing out of appellant's manner of handling his job, his lack of cooperation within his office, his mismanagement of his staff, his refusal to comply with the terms of his job description, and his refusal to follow instructions from his supervisor." *Id.* at 1329. *See also Smith v. Singer Co.,* 650 F.2d 214 (9th Cir.1981).

In *Smith v. Singer Co., supra,* Smith brought an action against Singer Company ("Singer") alleging that Singer violated 42 U.S.C. § 2000e–3(a) by terminating his employment as director of industrial relations because he engaged in protected activities. The Ninth Circuit gave the following description of Smith's position:

> The job required appellant to develop affirmative action programs; assist in identifying problem areas; assist management in solving problems; design audit and reporting systems to measure the effectiveness of the programs; serve as a liaison between the contractor and the enforcement agencies and between the contractor and the minority, women's and community action groups; and keep management informed of the latest de-

velopments in equal opportunity enforcement.

*Id.* at 215. Smith asserted that his discharge was retaliatory because "he encountered lack of cooperation and commitment from the company in his efforts to accomplish needed reforms in the affirmative action program...." *Id.* The district court, however, found that Singer discharged Smith "for failure to perform tasks fundamental to his position" because Smith had filed complaints against Singer with the Contracts Compliance Division of the Defense Contracts Administration Service and the Equal Employment Opportunity Commission and then denied "knowledge of the identity of the charging parties." *Id.* at 216. The Ninth Circuit observed that:

It was the very purpose of appellant's job to assist Singer in achieving such [voluntary] compliance; the job was held by him not as a private attorney general but as a company executive. The position was unique in that it required the occupant to act *on behalf of* his employer in an area where normally action against the employer and on behalf of the employees is protected activity.

*Id.* at 217. The court concluded:

By filing complaints against Singer because he disagreed with their choice of policies, appellant placed himself in a position squarely adversary to his company. In so doing he wholly disabled himself from continuing to represent the company's interests as its liaison with the enforcement agencies, and from continuing to work with Singer executives in the voluntary development of nondiscriminatory hiring programs.

*Id.* Since Smith had "rendered himself unable to fulfill the functions of his office," *id.,* the Ninth Circuit held that Singer neither discriminated nor retaliated against Smith in terminating his employment. Accordingly, the Ninth Circuit affirmed the district court order dismissing Smith's complaint.

The District Court, however, distinguished *Smith v. Singer Co.* on the grounds that the similarity between that case and this case "begins and ends with the recitation of the job description." Joint Appendix at 66. The District Court reasoned:

The plaintiff in *Smith* secretly filed complaints against his employer, and clandestinely solicited other employees to do so. He had gone to war with the company while his job required him to work with it to effect affirmative action, to ameliorate violations of Title VII, and to act as a liaison to the agencies with whom he had filed charges. Under such circumstances, he clearly could not perform, and in fact was not performing, the duties of his employment. In the present case, however, the plaintiff was trying conscientiously to get the defendant to mend its ways, and to be conciliatory with employees who had filed or were likely to file complaints against it. This was the ultimate purpose of plaintiff's employment, and far from being opposed to the defendant's interests, was strongly supportive of them.

Joint Appendix at 66–67. In a footnote, the District Court continued:

The Ninth Circuit, the same court that decided *Smith,* is the only court which has referred to it in a published opinion. In *Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346 (9th Cir.1984), the court distinguished the *Smith* decision, emphasizing that Smith concealed his actions, and because of them negated his ability to do his job. *Id.* at 1355 n. 6. Similarly, in the cause before this Court, plaintiff never employed subterfuge or so aligned herself with interests adverse to defendant as to render her incapable of performing her duties.

Joint Appendix at 67 n. 2.

Although in *Wrighten v. Metropolitan Hospitals, Inc.,* 726 F.2d 1346, 1355 n. 6 (9th Cir.1984), the Ninth Circuit initially may have limited *Smith v. Singer Co., supra,* to the facts of that case, in *Unt v. Aerospace Corp.,* 765 F.2d 1440, 1446 (9th Cir.1985), the Ninth Circuit cited *Smith v. Singer Co.* after stating that:

An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals.

*Id.* at 1446 (citations omitted). Consequently, we do not restrict *Smith v. Singer Co.* to its unique facts.

Owens argues that plaintiff's overbearing and adversarial attitude disabled her from continuing to work with company executives in the voluntary development of affirmative action programs. Although Owens hired plaintiff to manage the company's affirmative action programs and to design and implement affirmative action plans that would comply with Executive Order No. 11,246, Owens did not hire plaintiff to handle discrimination complaints or to establish the company's affirmative action policies.[5] In acting like a "compliance officer," plaintiff disabled herself from continuing to work with company executives in the voluntary development of affirmative action programs. The District Court held that plaintiff's "zeal to do the work she was employed to do tended to make [her] more rigid and unyielding in her demands than she perhaps should have been." Joint Appendix at 58–59.

Finally, the District Court implicitly acknowledged that plaintiff had engaged in numerous instances of unsatisfactory behavior during her six-week employment with Owens. After discussing plaintiff's trip to Owens' Shreveport, Louisiana plant, the District Court stated:

> Plaintiff took longer to come back than she might have taken, and was ill when she returned. This interfered with her reporting in person to her superior. There was also a misunderstanding about a meeting plaintiff had scheduled with community leaders in Shreveport.

When she was told to return to Toledo, she cancelled the meeting, feeling that it would be in vain without the support of her superiors. This does not appear to have been an unreasonable action, in view of the totality of the circumstances, but is cited by the defendant as another instance of plaintiff's insubordination and inability to perform her job.

> When plaintiff returned to Toledo, she compounded the wrong of coming late by sending a written memorandum, not only to her immediate superior, but to his superior. This, of course, is the unpardonable corporate sin, not going through channels. It was followed by plaintiff's discharge.

Joint Appendix at 60–61. We hold, as a matter of law, that plaintiff never proved, by a preponderance of the evidence, that the legitimate reasons that Owens offered for her termination were but a pretext for retaliation. Owens was entitled to decide the manner in which the company would implement its affirmative action programs. Owens was not required to accept plaintiff's position that her job included compliance work as well as writing and amending affirmative action plans. Consequently, we reverse the judgment for plaintiff on the "opposition clause" claim.

## II.

Plaintiff argues that the District Court erroneously dismissed her claim for wrongful discharge under Ohio law. As to that claim, the District Court granted Owens' Fed.R.Civ.P. 41(b) motion to dismiss plaintiff's amended complaint. The District Court reasoned that since the employment contract between plaintiff and Owens had an indefinite duration, under Ohio common law the agreement was terminable at will by either party. Accordingly, the Dis-

---

5. Philip Anthony, plaintiff's immediate supervisor and the company's Manager, Equal Opportunity Programs Administration, recruited plaintiff to replace John Gregory. Anthony's supervisor, John Chadwell, another black male who was the Company's Director of Human Resources Administration, approved plaintiff's hiring. Owens had previously shifted Gregory, a black male, to the newly created position of Manager, Equal Opportunity Compliance Programs. In that position, Gregory reported to Anthony and was responsible for handling employment discrimination charges and complaints.

trict Court concluded that the "employment at will" doctrine barred recovery.

Plaintiff contends that the District Court erred in not recognizing a "public policy" exception to the "employment at will" doctrine. Plaintiff argues that Owens terminated her employment because she advocated compliance with Executive Order No. 11,246, which she claims sets forth the public policy of the United States. Although plaintiff's counsel mentioned a public policy argument while responding to Owens' Fed.R.Civ.P. 41(b) motion and in closing argument, plaintiff did not assert this exception in her complaint nor did the parties try this theory in the District Court. Rather, plaintiff based her state law wrongful discharge claim on fraud, misrepresentation, and breach of contract. Consequently, we will not allow plaintiff to raise this "public policy" exception, for the first time on appeal, almost ten years after plaintiff filed her original complaint. *See, e.g., Bender v. Southland Corp.*, 749 F.2d 1205, 1215 (6th Cir.1984); *Ghandi v. Police Department of the City of Detroit*, 747 F.2d 338, 343 (6th Cir.1984) (citations omitted) ("Having presented their claims in the district court under one theory, plaintiffs cannot save their claim against the FBI by proceeding under a new theory on appeal."). Furthermore, in *Phung v. Waste Management, Inc.*, 23 Ohio St.3d 100, 491 N.E.2d 1114 (1985), the Supreme Court of Ohio recently held that: "An at-will employee who is discharged for reporting to his employer that it is conducting its business in violation of law does not have a cause of action against the employer for wrongful discharge." 491 N.E.2d at 1117 (paragraph two of the syllabus.)[6] Therefore, we conclude that the District Court did not err in dismissing plaintiff's state law claim for wrongful discharge.

Accordingly, we reverse the District Court's order granting judgment for plaintiff and remand the action to the District Court with instructions to dismiss plaintiff's complaint.

---

6. Under Ohio practice, the syllabus of a decision of the Supreme Court of Ohio rather than the text of the opinion states the law of the case.

*See Cassidy v. Glossip*, 12 Ohio St.2d 17, 231 N.E.2d 64 (1967).