[Cite as *Brown v. Corr. Reception Ctr.*, 2020-Ohio-684.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Alicia Brown, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 19AP-104 |
| v. | : | (Ct. of Cl. No. 2018-00021JD) |
| Correctional Reception Center, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on February 27, 2020

**On brief:** *Kemp, Schaeffer & Rowe, Co., LPA,* and *Erica A. Probst*, for appellant. **Argued:** *Erica A. Probst.*

**On brief:** *Dave Yost*, Attorney General, *Eric A. Walker* and *Timothy M. Miller*, for appellee. **Argued:** *Timothy M. Miller.*

APPEAL from the Court of Claims of Ohio

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Alicia Brown, appeals from a decision of the Court of Claims of Ohio entered on February 4, 2019 granting summary judgment against her and in favor of defendant-appellee, the Correctional Reception Center ("CRC"), on her claims for racial employment discrimination and retaliation. Her appeal is limited, however, to her claim for retaliation.[1] Because, on de novo review, we find there are genuine issues of fact as to each of the disputed elements of Brown's claim for retaliation, we reverse the granting of summary judgment against her on that claim and remand for further proceedings.

---

[1] It was not clear from her briefs which claims she was appealing. However, during oral argument, counsel for Brown clarified that she is not appealing the rulings on her discrimination claim, only the retaliation claim.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  Brown began this case by filing a complaint against CRC for racial discrimination and retaliation after she confronted her boss with charges of racism on January 26, 2017, which allegedly caused him to immediately fire her.  (Jan. 3, 2018 Compl. at ¶ 13, 16.)  CRC answered, admitting that a confrontation took place in which Brown accused her boss, Anthony Ayers, of racism, but CRC denied that she was fired.  (Jan. 30, 2018 Answer at ¶ 16-17.)

{¶ 3}  After the parties conducted discovery, including ten depositions which were filed in the trial court and are part of the record,[2] CRC moved for summary judgment on both of Brown's claims.  (Nov. 5, 2018 Mot. for Summ. Jgmt.)  CRC argued that Brown was never an employee of CRC, but rather, was an employee of a staffing agency, Around the Clock Healthcare ("ATC"), which placed her at CRC as an independent contractor.  *Id.* at 4-8.  CRC also argued that while Brown left employment after the disagreement with Ayers, Ayers did not actually take steps to fire her and she was not terminated by CRC.  *Id.* at 10-11.  Alternatively, CRC argued that Brown could not point to a similarly situated person not of the protected class who received better treatment or who replaced Brown.  *Id.* at 11-13.  Finally, CRC argued that Brown had not engaged in protected conduct for which CRC could have retaliated.  *Id.* at 13-15.  In addition to the depositions already on file with the trial court, CRC attached affidavits of two of Brown's superiors, Raphael Lilly and Ayers, as well as interrogatory answers from Brown.  (Lilly Aff., attached to Nov. 5, 2018 Mot. for Summ. Jgmt.; Ayers Aff., attached to Nov. 5, 2018 Mot. for Summ. Jgmt.; Mar. 21, 2018 Interrogs., attached to Nov. 5, 2018 Mot. for Summ. Jgmt.)

{¶ 4}  In her deposition, Brown testified that she worked as a health information technician ("HIT") at CRC under an arrangement with a staffing company, ATC.  (May 10, 2018 Brown Dep. at 24, 28-33.)  Her supervisors were Anthony Ayers (white), Robert Swackhammer (white), and Raphael Lilly (black).  *Id.* at 51-52.  Her last day at CRC was the day of her disagreement with Ayers, January 26, 2017.  *Id.* at 58.

{¶ 5}  On that day, Ayers informed her and a nurse, Kristina Gerber, that someone had reported witnessing them using foul language and that he wanted them to cease such

---

[2] Exhibits were used extensively in many of the depositions and have been cited extensively in CRC's brief. (CRC's Brief at 11-13, 15.)  However, with the exception of the exhibits for the depositions of Seese and Wolf, no exhibits were filed in the Court of Claims and none are in the record before this Court.

unprofessional behavior. *Id.* at 102-04, 107-09, 110-11. After Gerber excused herself from Ayers' office, Brown testified that she accused Ayers of harassing her, of racism, and of attempting to rid the workplace of black persons. *Id.* According to Brown, Ayers responded by telling her to "get out" or he would "have [her] escorted out of here." *Id.* at 110-11. Brown left the facility at that point before her shift was concluded. *Id.* at 58. She testified that, as she collected her things, she spoke to Swackhammer, telling him that she felt this was wrong. *Id.* at 111.

{¶ 6} Brown explained that her allegations regarding Ayers were based on a lengthy period of interactions with Ayers in which he appeared to excessively criticize her job performance relative to her coworkers. *Id.* at 128-29. She opined that this began after she took Lilly's side in a conflict between Lilly and Ayers that involved an internal investigation. *Id.* at 72, 77-79, 116-17. She observed that Ayers seemed to be generally more critical of black workers than white workers. *Id.* at 105. Ayers once remarked to her that he did not understand why Lilly who was "stupid" and "black" had been promoted. *Id.* She testified that Ayers and Swackhammer treated two white HITs better than they treated her, but also elaborated that those two enjoyed a rapport with Ayers and Swackhammer because they all went to bars after work together. *Id.* at 126-27. Brown denied indicating to anyone that she had been planning to leave the job voluntarily anyway. *Id.* at 112. However, she did admit to having written an e-mail to her recruiter at ATC regarding the incident. *Id.* at 30-31, 62-63. That e-mail (which was also made an exhibit to Wolf's deposition) reads as follows:

> From: [REDACTED]
> Sent: Thursday, January 26, 2017 3:03 PM
> To: Tiffany Wolf [REDACTED]
> Subject: Alicia Brown
>
> To whom it may concern on this above date 1/26/2017 Mr.Tony Ayers said I need to talk to you across the hall so I went to the office then the Nurse Christy Gerber was in the room also he then stated that I had some complaints about you and Gerber that you 2 are dropping the F- bomb then I stated that I am not the one doing that that is Gerber then he stated no let's not point fingers I reply by saying ok  what else i said then he said we are being to loud while they are examined intimates and we both are talking about each other when ones leaves the room and this was our warning next time it would be a right up that's all I am saying. Then I asked Mr.Ayers could I speak with him

alone he said yes. I asked Mr.Ayer why are you nit picking about everything I do now I always done my job since I been here and I think this is a back lash about what's going on with you and Mr. Lilly and you have been harassing me since I had to write a report pertaining to that. For instance last week when I called your office and spoke with Robert Swackhammer telling him that alot of intimates don't have their labs back and they couldn't be scheduled and Mr.Ayers was in the background yelling she doesn't know what she is doing so Robert reply by saying come up to our office which I did so Robert started looking through the computer and he said she is right. Them Mr.Ayers still continued to search and then replied by saying you check all these labs I said yes he then said Um and that was it. So I said I wrote a report on you of workplace harassment and I planned on  leaving today anyway because your not going to continue harassing me any more then he started yelling with all the intimates in the hallway get your stuff and get out now your no longer needed here i said you are very unprofessional and you don't like black people working up in Medway and everyone black here just leave or you get rid of them and then he also stated that's why Mr.Lilly got fined with 2days and I did not get anything out of that now. He then said I am going to report you to the Deputy Warden.  Another incident Mr.Ayers is upset about he authorized me to log under a state work to help them out in ECW the new computer system so I was questioned about that and told them Mr.Ayers knew because he authorized me to he denied that. Mr.Ayers in my opinion is upset about a incident with a HIT(Female) that Mr.Ayers got caught feeling on this female Elice and a state Nurse reported what she caught them doing and the 2 HIT that work in Medbay and Tony Ayers they go out drinking on Fridays together so they have a personal relationship which out of work.  If Mr. Ayers felt that I haven't ever did my job it's never been brought to my attention until this report I  had to write about him. I been there at CRC for 2years and I has always been praise about my work from Anthony Ayers until these incident with him and Mr.Lilly and other workers. I Spoke with Deputy Warden of Oops Fredericks about Mr.Ayers harassing me 2 weeks ago and he told me to write a report so I did this morning at 9:42am I have that report in a incident report I gave it to him today.

(Sic passim.) (Wolf Dep., Ex. A.)

{¶ 7}   Ayers agreed that he was one of Brown's supervisors in the sense that, as he and Swackhammer were healthcare administrators at CRC, they had supervisory authority over Lilly who, as the assistant healthcare administrator, had supervisory authority over all

HITs. (July 18, 2018 Ayers Dep. at 6-10.) Yet, Ayers testified that he did not fire Brown and, in fact, had never fired a HIT. *Id.* at 15. He explained that to fire someone he would have had to have involved the deputy warden. *Id.* at 29-30. He admitted, however, that he wrote an incident report about Brown regarding a disagreement between them. *Id.* at 16-18. According to Ayers, he received a complaint from an unnamed "advanced level provider" that Brown and Gerber were yelling, cursing, and being unprofessional. *Id.* at 62-63. After confirming the report with the other "advanced level providers" in the area, he went to talk to Gerber and Brown and invited them to his office. *Id.* Gerber promised to clean up her language, but Brown denied using inappropriate language and asked to talk to him privately. *Id.* at 63. Gerber left. *Id.* After Gerber stepped out, Brown began to accuse Ayers of harassing her and nit-picking her work, she called him a racist, and accused him of trying to get rid of all the black employees. *Id.* at 16-18, 64-65. She continued yelling these accusations as she left the room and began to pack up. *Id.* at 16-18, 65-66. Ayers stated that the reason he completed an incident report was because Brown was yelling these allegations as she left his office in full view of inmates. *Id.* at 17-18. He testified that immediately after leaving his office, Brown gathered her belongings and left CRC, thereby "abandoning" her job. *Id.* at 16-18. He maintained that although he filed an incident report and notified ATC that Brown had abandoned her job, he never told Brown to leave and took no steps to bar her from returning. *Id.* at 66-67, 70.

{¶ 8} In connection with the motion for summary judgment, Ayers supplemented his testimony with an affidavit. In the affidavit, he repeated his assertions about what happened between him and Brown on January 26 and reaffirmed that she was not terminated. (Ayers Aff. at ¶ 2-3, attached to Nov. 5, 2018 Mot. for Summ. Jgmt.) Ayers specifically recounted the administrative steps that would need to be taken to fire a HIT, including the need to get approval from the deputy warden, the requirement that the person be escorted out and their badge confiscated for security reasons, the need to communicate the termination to building security to effectively prohibit the person from reentering the grounds, and the need to inform the staffing company that the HIT would no longer be permitted to work at CRC. *Id.* at ¶ 4. At no time did Ayers take any of those steps with respect to Brown. *Id.* Rather, he swore that she was free to return on her next scheduled work day and explain to management why she left her job on January 26, 2017. *Id.* at ¶ 5. He also swore that Gerber, as a nurse and employee of CRC who was in the public employee

bargaining unit, was not a similarly situated employee and, further, that he was unaware of any report Brown may have filed against him in regard to a dispute between him and Lilly. *Id.* at 7-8.

{¶ 9} In her deposition, Gerber confirmed that she and Brown were called into Ayers' office regarding a complaint about foul language. (July 18, 2018 Gerber Dep. at 8-9.) She said she promised to be more careful about her language in the future and excused herself from Ayers' office and headed across the hall, shutting the door behind her. *Id.* at 9. She could not remember the exact verbiage, but she heard Brown yelling something to the effect of, "seems like all you're trying to do around here is fire black people" or perhaps, "get black people in trouble." *Id.* at 10. Gerber did not report hearing anything Ayers said other than that Ayers asked her, as Brown was leaving, if she had heard what Brown said. *Id.*

{¶ 10} Lilly testified that, as an assistant healthcare administrator, he was subordinate to Swackhammer and Ayers but held supervisory authority over all HITs (including Brown). (July 18, 2018 Lilly Dep. at 6, 10-11.) Lilly stated that when HITs are fired for cause, someone at CRC calls the staffing company and they are placed on a banned list that prevents them from working at other Ohio Department of Rehabilitation and Correction ("ODRC") institutions. *Id.* at 9-10. He also explained the hiring process for new HITs: He would request a new HIT from the staffing company on behalf of CRC, the staffing company would send over information about the proposed person for placement, CRC would perform a background check, and if the person was not excluded from working at CRC by that, they would appear for orientation and begin work. *Id.* at 11-12.

{¶ 11} Lilly, a black male, agreed that he had filed reports against Ayers in the past for nit-picking his work and opined that Ayers seemed to have an issue with black people. *Id.* at 17-19, 21. He stated that Brown's job performance was good and that he had never received any reports about Brown using foul language. *Id.* at 21-22. He had also heard Ayers make off-color remarks about some employees' race or ethnicity. *Id.* at 45-47. Although Lilly was not a witness to the events involving Brown and Ayers on the day Brown left CRC, Brown had recounted the events to Lilly after the fact. *Id.* at 41-42. Lilly recalled that Brown said she accused Ayers of racism and Ayers responded by telling her to get out, whereupon she left in order to avoid being escorted out. *Id.* Lilly stated that Ayers also

recounted the event to him, asking him to request a new HIT from the staffing company because, when he talked to Brown about her job performance, she called him a racist and then left.  *Id.* at 40-41.

{¶ 12} Lilly supplemented his testimony with an affidavit in support of CRC's motion for summary judgment.  In his affidavit, he swore that after Brown left, her duties were performed by a black female HIT who was already working at CRC.  (Lilly Aff. at ¶ 3.) After that HIT left on March 17, 2017, the position was vacant until June 1, 2017, when it was filled with a white female HIT assigned by the staffing company to work at CRC.  *Id.* Lilly noted that, as of the date of his affidavit, September 5, 2018, Brown was still working for ODRC as a HIT but at a different institution.  *Id.* at ¶ 4.

{¶ 13} Swackhammer had little memory of incidents between Brown and Ayers. (Aug. 1, 2018 Swackhammer Dep. at 7-8.)  However, he remembered that on the day Brown left, as she was packing her belongings, she told Swackhammer he needed to "get [his] boy in check," in reference to Ayers.  *Id.* at 13.  Brown also related that she had been planning to leave on Friday[3] anyway.  *Id.*

{¶ 14} George Frederick, the deputy warden of operations at CRC, testified that Brown was a HIT who was supervised by Ayers and Swackhammer.  (Aug. 1, 2018 Frederick Dep. at 5-7.)   He initially recalled that Brown left because she did not like the work atmosphere but then remembered that Brown told him she had called Ayers a racist and that Ayers had told her to "get out."  *Id.* at 8-9.

{¶ 15} Neither of the two deponents from the staffing company had received any information from CRC to suggest that Brown was terminated.  (July 19, 2018 Seese Dep. in passim; July 19, 2018 Wolf Dep. in passim.)  Two other deponents from CRC also testified about matters not relevant to this appeal.  (July 19, 2018 Wright Dep. in passim; Aug. 1, 2018 Reynolds Dep. in passim.)

{¶ 16} Based on the summary judgment record, the trial court determined that, construing the evidence in Brown's favor, CRC retained a degree of control over the manner and means of her work sufficient to subject it to liability as an employer.  (Feb. 4, 2019 Decision at 8.)  However, it concluded that even construing the evidence most strongly in favor of Brown, she did not suffer an adverse employment action because she was not, in

---

[3] January 26, 2017 was a Thursday.

fact, terminated. *Id.* at 11. Specifically with respect to the discrimination claim, the Court of Claims found, based on Lilly's affidavit, that Brown was not directly replaced by a white HIT. *Id.* at 11-12. It also reasoned that Gerber, as a union nurse, was not similarly situated to a HIT and did not, in any event, engage in the same behavior as Brown and thus could not serve as an example of a comparable non-protected person who was treated more favorably. *Id.* at 12. With respect to the retaliation claim, the trial court found that Brown had not engaged in protected conduct about which there could have been retaliation as she did not file an Equal Employment Opportunity Commission claim until after her employment had already ended. *Id.* at 15.

{¶ 17} Brown now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 18} Brown alleges two errors for our review:

> [1.] The Trial court Determination that there was No Retaliation is Contrary to Law.
>
> [2.] The Trial Court's Determination Appellant Resigned is In Error. The Court inappropriately weighed Evidence when there was A Material Issue of Fact Which Was Disputed by both Appellant and Appellee.

(Capitalization original.)

## III. STANDARD OF REVIEW

{¶ 19} Civ.R. 56(C) provides that:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who

> files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996 Ohio 107, 662 N.E.2d 264.

*Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; *see also, e.g., Esber Beverage Co. v. Labatt United States Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 20} The Supreme Court has also discussed in detail the relative burdens of movant and nonmovant:

> [A] party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion that the nonmoving party has no evidence to prove its case. Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.

*Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Byrd* at ¶ 25. When reviewing a trial court's decision on summary judgment, our review is de novo and we therefore apply the same standards as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

## IV. DISCUSSION

### A. First Assignment of Error – Whether the Trial Court Misconstrued the Retaliation Claim

{¶ 21} R.C. 4112.02 prohibits retaliation by an employer against an employee:

> It shall be an unlawful discriminatory practice:

> * * *

(I)  For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

R.C. 4112.02(I).  The Supreme Court has explained, "we have determined that federal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000(e) *et seq.*, Title 42, U.S.Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Little Forest Med. Ctr. v. Ohio Civil Rights Comm.*, 61 Ohio St.3d 607, 609-10 (1991).  Thus, where appropriate, we and other courts refer to federal caselaw in this context.

{¶ 22}  The Supreme Court has explained that to establish a prima facie case of retaliation:

[A] claimant must prove that (1) she [or he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action.

*Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, ¶ 13, citing *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990).  "If a complainant establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions."  *Greer-Burger* at ¶ 14, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Then, "[i]f the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason for the employment decision.' "  *Greer-Burger* at ¶ 14, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

{¶ 23}  Brown argues that her statement to Ayers that he was racist constituted a protected activity because it was "oppos[ition to] any unlawful discriminatory practice." R.C. 4112.02(I).  When this protected accusation was met with an immediate statement by Ayers that she had to "get out" or she would be "escorted out," Brown argues the prima facie claim for retaliation was complete.  (Brown Brief at 16-17.)

{¶ 24}  It is undisputed that Ayers knew that Brown accused him of being racist; even according to his testimony, she made the accusation in person to his face.  (Ayers Dep. at

16-18, 64-65.)  There is no doubt that, under Brown's stated view of the confrontation with Ayers, the alleged termination was directly and immediately provoked by the allegation that Ayers was racist.  (Brown Dep. at 102-04, 107-09, 110-11.)  The questions pivotal to this assignment of error are whether Brown was terminated and whether the direct in-person oral allegation of racism constitutes protected activity to support a retaliation claim.  We first consider whether Brown's confrontation of Ayers constituted protected activity.

{¶ 25} The Sixth Circuit Court of Appeals has explained how to draw the line between protected "oppos[ition to] any unlawful discriminatory practice" and unprotected acts.  R.C. 4112.02(I); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1313 (6th Cir.1989).

> " '[T]he opposition clause' [citation omitted] does not protect all 'opposition' activity." *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir.), cert. denied, 479 U.S. 1008, 93 L. Ed. 2d 704, 107 S. Ct. 649 (1986).  Courts are required "to balance the purpose of the Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel. . . . The requirements of the job and the tolerable limits of conduct in a particular setting must be explored." *Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 231 (1st Cir. 1976); *see also Mozee v. Jeffboat, Inc.*, 746 F.2d 365, 374 (7th Cir. 1984). "There may arise instances where the employee's conduct in protest of an unlawful employment practice so interferes with the performance of his job that it renders him ineffective in the position for which he was employed. In such a case, his conduct, or form of opposition, is not covered . . . ." *Rosser v. Laborers' Intern. Union*, 616 F.2d 221, 223 (5th Cir.), cert. denied, 449 U.S. 886, 101 S. Ct. 241, 66 L. Ed. 2d 112 (1980). An employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals. *Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985).

*Booker* at 1312.  We also have previously remarked:

> In order to engage in a protected opposition activity * * * a plaintiff must make an overt stand against suspected illegal discriminatory action." *Comiskey v. Automotive Industry Action Group* (E.D.Mich. 1999), 40 F. Supp. 2d 877, 898. "[A] vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an

> unlawful employment practice." *Booker * * *,* 879 F.2d [at] 1313.

*Jackson v. Champaign Natl. Bank & Trust Co.,* 10th Dist. No. 00AP-170, 2000 WL 1376534, 2000 Ohio App. LEXIS 4390, *19 (Sept. 26, 2000).

{¶ 26} CRC argues that Brown's accusation of racism did not rise to the level needed so as to be protected activity because "a simple assertion that a supervisor is racist is not protected activity." (CRC's Brief at 19). It cites only *Booker* for this proposition. But applying *Booker* to Brown's allegations requires further analysis.

{¶ 27} The *Booker* court reasoned that a letter sent by Booker, the aggrieved employee, to company management did not constitute protected activity because it was found not to be in opposition to an unlawful employment practice:

> An examination of the letter indicates that it is not in opposition to a violation of the Act. Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer. Booker generally attempts to dispute the employer's position with regard to his managerial style, and he suggests that the focus of the company's inquiry should be on his supervisor[].
>
> There are only two possible allegations in the letter that suggest Booker may have been contesting an unlawful employment practice. Booker suggests that [his supervisor] may be a racist due to a statement he allegedly made. However, the allegation is not that [the employer] is engaging in unlawful employment practice, but that one of its employees has a racial intolerance.
>
> The only other possible suggestion of opposition is when Booker alleges that the charges against him are a result of "ethnocism." Assuming that Booker intended discrimination, we hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination. In our view, such would constitute an intolerable intrusion into the workplace.

(Footnote omitted.) *Booker* at 1313.

{¶ 28} Viewing the evidence before the Court of Claims in a light most favorable to Brown, her charge of racism was neither vague nor inappropriate in the ways discussed in *Booker* and *Jackson*. According to Brown, she asked to speak to one of her three supervisors (Ayers) privately in his office. (Brown Dep. at 102-04, 107-09, 110-11.) Then, in a private conversation away from inmates and the potential of disrupting the workplace, she expressed the view that he was being excessively critical of her work on account of her standing up for someone of her same race, that he had engaged in a campaign to drive other black workers away from the workplace, and that he was racist. *Id.* Viewed from the perspective required on summary judgment, the conversation as recounted by Brown could constitute taking an "overt stand against" suspected illegal workplace discrimination and be protected opposition within the meaning of R.C. 4112.02(I). *Jackson*, 2000 Ohio App. LEXIS 4390, *19; *Comiskey v. Automotive Industry Action Group,* 40 F.Supp.2d 877, 898 (E.D.Mich.1999). While we understand that Ayers and CRC have a different view of what transpired on January 26, 2017 and in the time leading up to it, the character of Brown's accusations and the nature of the relationship between Ayers and Brown are disputed factual questions that must be resolved by trial before a factfinder empowered to make credibility determinations–not on summary judgment, requiring that the evidence must be construed most strongly in favor of Brown.

{¶ 29} Brown's first assignment of error is sustained. However, because the Court of Claims determined that Brown was not terminated, we review her second assignment of error.

### B. Second Assignment of Error – If there was a Genuine Dispute of Fact as to Whether Brown was Terminated

{¶ 30} CRC successfully argued before the Court of Claims that Brown was not terminated from her position. (Feb. 4, 2019 Decision at 11; Nov. 5, 2018 Mot. for Summ. Jgmt. at 10-11.) On appeal, CRC continues to maintain that Brown was not terminated because, even based on the summary judgment record, the undisputed evidence shows that Ayers never took the administrative actions necessary to terminate her. (CRC's Brief at 19-20.) Brown has replied that the evidence is in conflict over what Ayers said and did and that the case therefore is not appropriate for summary judgment. (Brown's Brief at 21-22; Brown's Reply Brief at 5-11.)

{¶ 31} The federal court in the Western District of Oklahoma addressed a situation where a supervisor told an employee "that due to [her] pregnancy, [her] doctor's appointments and not being able to be there as much as the other girls that [she] couldn't perform [her] job duty and that they would have to let [her] go." *White v. Hammer Constr., Inc.*, Case No. CIV-04-732-F, 2005 WL 1606450, 2005 U.S. Dist. LEXIS 37122, *4 (W.D.Okla.2005). In deciding summary judgment in that case, the district court discussed the arguments of the parties about whether the plaintiff had been terminated:

> In its motion, [the employer] contends that [the plaintiff] is unable to establish a prima facie case because she cannot show that she was terminated or suffered any other adverse effect on her employment. [The employer] contends that only [the company president] had the authority to fire employees and [the company president] never terminated [the plaintiff]. * * * As to [the supervisor], [the employer] contends that [the supervisor] knew she could not fire employees. [The employer] also asserts that [the supervisor] testified that she had never talked to [the company president] about any plans to fire [the plaintiff] and that she had no plan to fire [the plaintiff]. Furthermore, [the employer] asserts that when [the plaintiff] returned the next day to pick up her paychecks, [the supervisor] told her she had not fired [the plaintiff]. [The employer] contends that despite all the signs that she had not been fired, [the plaintiff] failed to avail herself of any recourse by going to [the company president] to discuss the alleged termination. * * *
>
> [The plaintiff] contends that [the supervisor] had apparent authority to terminate her. Indeed, [the plaintiff] asserts that [the supervisor] specifically told [the plaintiff] that "we will have to let you go." [The plaintiff] contends that [the supervisor] was her direct supervisor and never communicated to [the plaintiff] that she did not have authority to terminate her. [The plaintiff] also contends that [the company president] conceded in deposition that it is possible that [the supervisor]' statement to [the plaintiff] could have left a clear impression that [the plaintiff] was being fired. [The plaintiff] therefore contends that the question of whether [the supervisor] terminated her on April 24, 2003 is a question for the jury.
>
> Viewing the evidence in a light most favorable to [the plaintiff], the court concludes that [the plaintiff] has raised a genuine issue of fact as to whether she was discharged. The jury, not the court, must decide whose version of the April 24, 2003 conversation, [the plaintiff]'s or [the supervisor]' version, is to

be believed. Although [the supervisor] may not have had express authority to fire employees, there is a question of fact as to whether [the supervisor] acted with apparent authority in terminating [the plaintiff]. [The supervisor] was [the plaintiff]'s direct supervisor. She was involved in the interview process and had input into the decision to hire [the plaintiff]. According to [the plaintiff]'s version of the April 24, 2003 conversation, [the supervisor] professed an authority to terminate [the plaintiff] by stating that "we will have to let you go." Moreover, [the plaintiff] testified that "[the supervisor] has always -- she always made decisions. She was -- she was the boss when [the company president] was not there." The court concludes that [the plaintiff] has presented sufficient evidence to raise a genuine issue of fact as to the third element of her prima facie case, that she was discharged from her employment.

(Citations omitted.) *Id.* at *7-10.

{¶ 32} Similarly, in the Western District of Michigan, a federal court deciding summary judgment on the question of termination said this:

[A]lthough the parties hotly contest whether [the store manager] had the authority to terminate employees, [the plaintiff] has produced evidence that [the store manager] had significant input into promotion and termination at the Benton Harbor store. Although [the employer company] has introduced evidence that [the store manager] lacked actual authority to terminate employees, at a minimum, [the plaintiff] has established an issue of fact as to whether [the store manager] had apparent authority to promote and terminate employees.

*Wright v. AutoZone Stores, Inc.*, 951 F.Supp.2d 973, 991 (W.D.Mich.2013).

{¶ 33} Here, there is no dispute that Ayers was one of Brown's supervisors. (Ayers Dep. at 6-10; Frederick Dep. at 5-7.) Viewing the evidence in a light most favorable to Brown, Ayers told her to "get out" or he would "have [her] escorted out of here." (Brown Dep. at 110-11.) Drawing all reasonable inferences in favor of Brown, there is a genuine issue of material fact about whether she had been terminated by someone with apparent authority do to so. CRC attaches great importance to the fact that Brown indicated she had planned to leave anyway and that Ayers never followed up on his alleged "get out" statement by going through the proper channels to terminate Brown. (CRC's Brief at 20.) But the Court of Claims' summary judgment in favor of CRC ignores the relative employment

positions of the parties. When Brown left, she thought she was terminated and stated that she did not want to be escorted out. Based on Ayers' authority (two supervisors above her), her return to CRC may be construed to have been unlikely. Yet, when Brown declared to Ayers (as she recounted in her e-mail to ATC), "I planned on leaving today anyway because your [sic] not going to continue harassing me any more [sic]," Ayers would reasonably have assumed that he did not need to undertake the formal steps of terminating Brown because she was not coming back. (Wolf Dep. Ex. A; Brown Dep. at 110-11.) Thus, under the view of the evidence most favorable to Brown, Ayers' and Brown's actions after the "get out" statements are consistent with Ayers having terminated Brown and simultaneously believing he had no need to follow through with the formalities of termination because Brown was not intending to return. In short, construing the evidence most strongly in favor of Brown, there is a genuine issue of fact as to whether she suffered an adverse employment action.

{¶ 34} Brown's second assignment of error is sustained.

## V. CONCLUSION

{¶ 35} Construing the evidence in Brown's favor after conducting a de novo review, we find that there are genuine issues of fact as to each of the disputed elements of Brown's claim for retaliation. Accordingly, Brown's retaliation claim is not suitable for resolution on summary judgment according to the evidence in the record at this juncture, and we sustain Brown's two assignments of error. The judgment of the Court of Claims of Ohio is reversed and remanded.

*Judgment reversed and remanded.*

BEATTY BLUNT and NELSON, JJ., concur.

————————————